**In the Matter of SPRING VALLEY DE-
VELOPMENT By Lakesites, Inc.**

Supreme Judicial Court of Maine.

Feb. 9, 1973.

738 ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Verrill, Dana, Philbrick, Putnam & Williamson by Loyall F. Sewall, Portland, for Spring Valley.

E. Stephen Murray, Asst. Atty. Gen., Augusta, for Environmental Improvement Comm.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEATHERBEE, Justice.

Raymond Pond is located in the town of Raymond and is slightly more than one mile in length. Lakesites, Inc. is the owner of a large tract of land containing about 92 acres located on one side of the Pond. Lakesites' development of this land into a residential subdivision has been interrupted by an order of the Environmental Improvement Commission directing it to cease the operation of this development until Lakesites has applied for and received the Commission's approval of its development.

The Commission claims to have derived its authority for this order from 38 M.R. S.A. §§ 481–488, Site Location of Development Law, hereinafter referred to as the Site Location Law. Lakesites' appeal attacks both the Commission's interpretation of the Act as including residential subdivisions and the Act's constitutionality. We conclude that the authority of the Commission does extend to residential subdivisions and that the statute represents a valid exercise of the police power. We deny the appeal.

The agreed statement of facts and the testimony presented at hearing before the Commission reveal that Lakesites' property extends along the shore of the Pond at least 3400 feet.[1] Lakesites has subdivided this tract into 90 lots ranging in size from 20,000 square feet to 53,000 square feet with several other areas reserved from sale. It refers to this property as its Spring Valley Development.

Lakesites has cleared and graded portions of this land, has built a road for ingress and egress and has surveyed the property, marking off the boundaries of the individual lots. While it contemplates that purchasers will build year-round or part-time homes on their lots it does not intend to construct or participate in the construction of the buildings or to control the use of the lots "except insofar as there are any required deed restrictions". No action has been taken with respect to providing services for any of the lots.

Lakesites proposes that the selling of these lots be a profitable venture and it has placed their sale in the hands of licensed real estate brokers.

Lakesites submitted its subdivision plan to the Raymond Planning Board which, after some changes had been made, approved it as satisfying the only subdivision requirement then existing in the town ordinance—that of lot size. The subdivision plan was then recorded in the Cumberland County Registry of Deeds.

There was in effect at this time the Site Location Law the constitutionality of which is under attack. This law required persons intending to construct or operate a development which may substantially affect local environment to notify, before commencing the construction or operation, the Environmental Improvement Commission of their intent and the nature and location of the development. If the Commission determines it to be necessary, a hearing shall be held at which the developer has the burden of satisfying the Commission that the development will not substantially adversely affect the environment or pose a threat to the public's health, safety or general welfare. 38 M.R.S.A. §§ 483, 484.

---

1. The testimony and map indicate a frontage on the Pond much in excess of this figure.

The Legislature defined developments which may substantially affect environment as meaning

". . . [1] any commercial or industrial development which requires a license from the Environmental Improvement Commission, [2] or which occupies a land area in excess of 20 acres, [3] or which contemplates drilling for or excavating natural resources, excluding borrow pits for sand, fill or gravel, regulated by the State Highway Commission and pits of less than 5 acres, [4] or which occupies on a single parcel a structure or structures in excess of a ground area of 60,000 square feet." 38 M.R.S.A. § 482(2).

Although Lakesites' development did occupy a land area in excess of 20 acres, it did not notify the Commission of its intentions. However, the Commission eventually learned of Lakesites' plans and proceeded at once to schedule and conduct a hearing as it is authorized to do by section 485. Notice of the hearing was given Lakesites.

Lakesites was represented at the hearing by its attorney who challenged the Commission's jurisdiction to regulate Lakesites' activity contending that the mere subdivision of land does not constitute a "commercial or industrial development" within the scope of the Site Location Law. The attorney made a formal objection to all testimony other than that relating to jurisdiction. He elected to waive his right to contest as to the merits of the case although he was offered full opportunity to do so, choosing not to offer evidence or to cross-examine witnesses who testified regarding the proposed development.

These witnesses testified at length as to various aspects of the environment which they said would be substantially adversely affected by the proposed development. Later, after consideration of the matter, the Commission made findings of fact [2] and held that Lakesites had failed in its burden to prove that its proposed development meets the standards for approval established by the Legislature in section 484 [3]

2. "1. Lakesites, Inc. is the owner of a lot or parcel of land located in Raymond, Maine, on or near Raymond Pond, exceeding 20 acres in size, to wit, 92 acres more or less.

2. Lakesites, Inc. has divided said 92 acres more or less, into approximately 90 lots ranging in size from 20,000 to 53,000 square feet.

3. Lakesites, Inc. has sold, is selling or is planning to sell or otherwise transfer interests in and to said lots to purchasers as a commercial venture, such lots to be used for year round or seasonal residential and/or recreational purposes.

4. Lakesites, Inc. has been and is operating a commercial development within the meaning of Title 38 M.R.S.A. § 482(2).

5. Lakesites, Inc. has made no application to nor submitted any evidence at the hearing held by the E.I.C. for approval pursuant to the Site Location of Development Law, although it was given ample opportunity to do so.

6. The record indicated that most of the soil in the area being developed by Lakesites, Inc. is of a steep slope and has a high seasonable water table.

7. The record indicated that most of the soil in the area is unsuitable for septic tank disposal of domestic sewage.

8. The development has been subdivided in such a fashion so that it will support housing for 90 families, all of whom must dispose of domestic sewage in some manner.

9. Since the developer, Lakesites, Inc., has not indicated that it has made any provision for collection, treatment or disposal of such sewage, and no municipal treatment and disposal system exists in the vicinity of the development, the only alternative is underground disposal of such sewage by means of a septic tank or related system.

10. The installation of up to 90 septic tank disposal systems in and upon the said development could degrade the quality of ground water in and around the said development, such ground water possibly being used for a drinking water supply, and degrade the waters of Raymond Pond."

3. "The commission shall approve a development proposal whenever it finds that:

1. Financial capacity. The proposed development has the financial capacity

and had failed to demonstrate that it had plans that would adequately protect the public's health, safety and general welfare. It issued an order denying Lakesites the right to proceed with its development until such time as it has made a proper application to the Environmental Improvement Commission and has received the Commission's approval.

From this decision of the Commission, Lakesites has appealed to the Supreme Judicial Court sitting as the Law Court, [38 M.R.S.A. § 487] raising specifically the issue as to whether the offering for sale of subdivided lots of the type owned by Lakesites is either a commercial or an industrial development[4] subject to the provisions of 38 M.R.S.A. §§ 481–488 and, secondarily, if the Site Location Law is applied to this developer, are there constitutional violations of Equal Protection and Due Process.

*The intent of the Legislature.*

As to the first issue, we seek the Legislature's intent.

"Legislative intent is the fundamental rule in the construction or interpretation of statutes. . . . Such a construction ought to be put upon a statute as may best answer the intention which the Legislators had in view, and when determinable and ascertained, the courts must give effect to it. . . ." King Resources Co. v. Environmental Improvement Commission, Me., 270 A.2d 863, 869 (1970).

In 1970 the 104th Legislature, meeting in special session, enacted several pieces of legislation directed toward reducing the destruction of our natural environment. One of the pieces of legislation introduced was L.D. 1834 entitled "AN ACT to Regulate Site Location of Development Substantially Affecting Environment" with which we are now concerned. After amendment it was enacted as P.L.1969, ch. 571, § 2 and became 38 M.R.S.A. §§ 481–488.

The Legislature's concise statement of its Findings and Purpose[5] makes clear to us the basis for its conclusion that state action was essential to insure that commer-

and technical ability to meet state air and water pollution control standards, has made adequate provision for solid waste disposal, the control of offensive odors, and the securing and maintenance of sufficient and healthful water supplies.

2. Traffic movement. The proposed development has made adequate provision for loading, parking and traffic movement from the development area onto public roads.

3. No adverse effect on natural environment. The proposed development has made adequate provision for fitting itself hormoniously into the existing natural environment and will not adversely affect existing uses, scenic character, natural resources or property values in the municipality or in adjoining municipalities.

4. Soil types. The proposed development will be built on soil types which are suitable to the nature of the undertaking."

4. The appellee makes no claim that Lakesites' project is an industrial development.

5. "Sec. 481. Findings and purpose

The Legislature finds that the economic and social wellbeing of the citizens of the State of Maine depend upon the location of commercial and industrial developments with respect to the natural environment of the State; that many developments *because of their size and nature* are capable of causing irreparable damage to the people and the environment in their surroundings; that the location of such developments is too important to be left only to the determination of the owners of such developments; and that discretion must be vested in state authority to regulate the location of developments which may substantially affect environment.

The purpose of this subchapter is to provide a flexible and practical means by which the State, acting through the Environmental Improvement Commission, in consultation with appropriate state agencies, may exercise the police power of the State to control the location of those developments substantially affecting local environment in order to insure that such developments will be located in a manner which will have a minimal adverse impact on the natural environment of their surroundings." (Emphasis added.)

cial and industrial developments, which *because of their nature or their size,* will impose unusually heavy demands upon the natural environment, shall not be located in areas where the environment does not have the capacity to withstand the impact of the development. But did the Legislature intend to bring *residential* developments within the application of the law? If so, did it intend to include mere subdivisions?

■ In seeking the legislative intent we turn first to the language which the lawmakers chose to use to carry out their purpose.

In reference to real estate, a "development" may be defined as "a developed tract of land" and "to develop" as "to convert (as raw land) into an area suitable for residential or business purposes" . . . "to alter raw land (into an area suitable for building)". Webster's Third New International Dictionary, 1967.

When we analyze the legislative definition of developments which may substantially affect environment we find that the Legislature saw fit to concern itself with two kinds of developments—1) those the operating procedures of which include the consumption of the natural resources themselves or which have a propensity to discharge, in the course of their processes, wastes and residues which lower the quality of surrounding air, soil or water and 2) those which are not *inherently* ecologically destructive but which because of their *size* are likely to impose great demands upon the environment.

The Legislature's concern for the first class is obvious. The operation of many industrial and some commercial developments—whether large or small—are likely to be direct assaults upon the environment itself. The ecological danger from the members of the second group, unlike the first, comes not principally from the type of activity to be performed on the property after it is developed but rather from the size and concentration of such developments. The Legislature's concern was that

*large* developments, apart from the type of activity located thereon, have an inherent potential for over-taxing the involved land, air and water upon which the public depends to sustain an acceptable quality of human living.

But the Legislature chose to apply the Act only to large developments which are industrial or commercial. The word "commercial" broadly means "from the point of view of profit" . . . "having profit as the primary aim". Webster's Third New International Dictionary, 1967.

■ We think that the use of the word "commercial" was intended to describe the *motivation* for the development and not the type of activity to be performed on the property after it is developed. We consider that the Legislature chose to distinguish between commercial and non-commercial developments for a sound reason—it doubtless concluded that a greater need for supervision exists in the case of a commercially motivated development where the dominant factor is the hope for profit than in a non-commercial development where land is being prepared for public enjoyment or divided for family distribution or for some other purpose than profit. In other words, commercial residential developments have a propensity for being big, concentrated and exhausting to the resources of the environment.

■ It seems to us that the business of subdividing large tracts of land and selling the lots must be considered a commercial venture. The Legislature doubtless so viewed it. Certainly, this construction best accords with the purpose of the statute. Strout v. Burgess, 144 Me. 263, 275, 68 A. 2d 241, 250 (1949).

This interpretation finds support in the history of the legislation we are examining.

This legislation was originally proposed to the 104th Legislature in the form of L. D. 1782 which stated that its purpose was to enable the State to guide and control the location of *commercial developments* which

substantially affect local environment. Such developments were described as including "any recreational, commercial, educational, industrial or residential development which by reason of its size, purpose, manufacturing process or use or handling of natural resources or products may tend to harm or adversely affect the natural environment of a locality to a substantial degree."

The Joint Select Legislative Committee on Natural Resources reported the bill back in a new draft, as L.D. 1834 and that it "Ought to pass". The new draft stated that its purpose was to enable the State to guide and control the location of commercial *and industrial* developments substantially affecting local environment. Such developments were characterized simply as commercial and industrial—the L.D. 1782 "recreational", "educational" and "residential" development language being dropped. The new draft as reported back also would have excluded from the operation of the Act developments intending "to locate in the appropriate zoned area of any municipality which had adopted a municipal plan and zoning and sub-division ordinances based thereon."

The Legislature eliminated the latter provision [6] thus rejecting the concept that local zoning is capable of protecting the public from ecological harm. The new draft, as amended, was then enacted and was the law existing at the time of the present problem here under consideration.[7]

In the 105th Legislature, two attempts were made to remove *certain* classifications of residential developments from the operation of the Act passed by the previous Legislature.

L.D. 963 was introduced in the 105th Legislature. Its sole purpose was to exclude by amendment "permanent year-round housing" occupying less than 40 acres from the operation of the Site Location Law. L.D. 963 was defeated.

At the same session L.D. 1061 was introduced. Its sole purpose was to exclude from "commercial developments" all residential developments in municipalities which have planning boards. The Statement of Fact accompanying L.D. 1061 explained the purpose of the Bill as follows:

"The Environmental Improvement Commission has asserted authority under the site location law passed at the Special Session over residential developments, even though the statute is limited to 'commercial and industrial developments.' This bill would clarify that this is not the intent of the law."

This clear attempt in L.D. 1061 to remove some residential developments from the Site Location Law was also defeated.

In considering both L.D. 963 and L.D. 1061 the Legislature had its attention specifically directed to the inclusion of residential developments. It is significant that, even if enacted, neither of them would have removed *all* residential developments from the operation of the law. The Legislature, with its attention specifically directed to the fact that the Commission was then construing the Act to give it authority over residential developments of over 20 acres, still refused two opportunities even to limit the Commission's power to exercise this authority.

It is a well accepted principle of statutory construction that when an administrative body has carried out a reasonable and practical interpretation of a statute and this has been called to the attention of the Legislature, the Legislature's failure to act to change the interpretation is evidence that the Legislature has acquiesced in the interpretation. Androscoggin Savings Bank v. Campbell, Me., 282 A.2d 858 (1971); Burrough of Matawan v. Monmouth County Board of Taxation, 51 N.J. 291, 240 A.2d 8, 13 (1968); 2 Sutherland, J. G., Statutes and Statutory Construction, (3rd Ed.) Frank E. Horack, Jr., § 5109.

6. House Amendment "A" (H–691).

7. P.L.1969, ch. 571, § 2.

The 105th Legislature also had before it L.D. 1257, L.D. 710 and L.D. 1790 (a new draft of L.D. 710). The significance of its action on these measures is obscure.

L.D. 1257 concerned itself in part with proposing some nine changes to the Site Location Law. One such change defined a "development which may substantially affect environment" as one specifically including municipal, educational, commercial or industrial developments "including real estate subdivisions". The Committee on Natural Resources reported L.D. 1257 in a new draft under the same title which no longer made reference to the Site Location Law, and it thus becomes irrelevant to the present discussion.

L.D. 710 proposed some eleven changes to the Site Location Law, one of which was to alter the definition of "development which may substantially affect environment" to specifically include "any state, municipal, quasi-municipal, educational, commercial or industrial development, including subdivisions". L.D. 710 defined a "subdivision" as meaning a division of an existing parcel of land into three or more parcels within any 5-year period. The Committee on Natural Resources reported L.D. 710 in a new draft, L.D. 1790, under the same title, which contained some ten changes to the Site Location Law. Among others, it would have amended the definition of developments which may substantially affect environment to read "any state, municipal, quasi-municipal, educational, charitable, commercial or industrial development, including subdivisions, but excluding public ways." L.D. 1790 then defined a "subdivision" as meaning the division of a parcel of land into two or more parcels within a 5-year period. The Statement of Fact accompanying the new draft included this explanation of purpose: "(6)

to make it clear that subdivisions are covered by the Site Law and to define 'subdivisions'." L.D. 1790 was defeated.

While the earlier actions of the Legislature in defeating the two attempts to exclude some residential developments from the Site Location Law appears to indicate clear-cut approval of the Commission's interpretation of the Act as including such developments—that is, L.D. 963 and L.D. 1061—the defeat of L.D. 1790 contributes little if anything to our understanding of legislative intent.

L.D. 963 and L.D. 1061 were specific attempts to remove *some* residential developments from the operation of the Act— tacitly recognizing the Commission's authority over residential developments—and both failed. L.D. 1790, on the other hand, not only would have made it "clear that subdivisions are covered" but would have given the word subdivisions a drastically wide meaning and would have worked several other important changes in the Site Location Law.[8]

We simply cannot say what one or more of these proposed changes or additions may have motivated the Legislature to reject L.D. 1790.

The Legislature met in special session in 1972 and considered L.D. 2045 which would amend the Site Location Law in several respects. One of these proposed changes added in section 482(2) after "commercial or industrial developments", the words "including subdivisions". The amendment's statement of purposes included "(2) to make it clear that subdivisions are within the coverage of the law . . . .". The attention of the Legislature was again specifically directed to the fact that the Commission was interpreting the Act to include residential developments

8. During legislative debate on L.D. 1790 in the House of Representatives, Representative Marion Fuller Brown informed the House that residential subdivisions had already been a major consideration in the administration of the Site Location Law. She said that in its administration of the Site Location Law to that date, the Environmental Improvement Commission had processed 102 applications for approval and 61% of these had involved subdivisions. Legislative Record—House, June 21, 1971, at 4397.

(Statement of fact accompanying House Amendment "A" to L.D. 2045) and that this present appeal from the Commission's order, involving a determination of legislative intent, was then pending in court (Remarks of Representative Owen L. Hancock, Legislative Record-House, 105th Legislature, 1st Special Session, 1972 at 799). The House was informed by Representative Louis J. Marstaller that the purpose of the bill was to make it clear that residential subdivisions are within the application of the Site Location Law (Legislative Record-House, 105th Legislature, 1st Special Session, 1972, at 798). Representative Earl H. Smith told the House in debate that 85% of the applications acted upon by the Commission in the past two years had been residential subdivisions (Legislative Record-House, 105th Legislature, 1st Special Session, 1972, at 886).

With this information before it, the Legislature enacted the amendment.[9]

We find it significant in our assessment of legislative intent that the 105th Legislature, aware that the Commission was interpreting the Act to include residential subdivisions, took no affirmative action to indicate a contrary intent, rejected two attempts to remove *some* residential subdivisions from the operation of the Act and finally acted to add the specific words "including subdivisions".

In our opinion the 104th Legislature intended to include commercial residential developments among those developments which may substantially affect environment. But did the Legislature intend the Act to affect commercial residential developments where the developer merely plots the tract, subdivides it into lots by plan and offers the lots for sale to the public?

We consider that this *was* the Legislature's intention. The basic theory of the Act, as disclosed by the Legislature's Statement of Purpose, is to insure that "such developments *will be located* in a manner which will have a minimal adverse impact on the natural environment of their surroundings". (Emphasis supplied.) The Legislature found "that the location of such developments is too important to be left only to the determination of the owners of such developments".

Section 483 requires a notification to the Commission by any person intending to construct or operate such a development before commencing constuction or operation. The Commission is then empowered to *approve the location* or schedule a hearing thereon.

The language of the Act and its clear underlying purpose reflect the Legislature's intention that a development with a particular propensity to damage the environment should not be located in areas where the environment is particularly incapable of sustaining the impact without public injury.

The Appellant argues to us that it was the Legislature's intention to prevent acts being done to the land which would harm the land and that, therefore, the law is directed to the person who will do the act—such as the builder—and not to the person who merely subdivides and sells the land. With this we cannot agree. The Legislature intended the Commission to scrutinize the proposals *before* the harmful act could be done. The Act is a preventive measure and the injury sought to be avoided can best be prevented as soon as plans for development reveal the harm which will occur upon its completion. We would hardly expect that the Legislature intended to postpone the determination of suitability of an area for a residential development until the lots had been sold to purchasers who will, upon starting construction, discover that they are participants in—as well as victims of—a local environmental disaster.

Furthermore, if a subdivider has sold the lots to numerous individual purchasers each of whom, among other things, is to

9. It became P.L. 1971, Special Session 1972, ch. 613 § 2.

construct his own building, grade his own land, build his own driveway to the street, and provide for his own sanitary sewage disposal, there would be no one "intending to construct or operate a development" who could be held responsible under the statute. We do not ascribe to the Legislature an intention that legislation so important to the public welfare would suffer from such inherent futility.

■ We consider that both the legislative intent and the statutory language of the Act encompass residential developments in which the developer merely subdivides the land into lots and offers the lots for sale without any intention to construct buildings or to provide additional improvements or services on the lots. We do not find that the Act as so interpreted and applied is constitutionally impermissible. The subdividing is the initial step in such a development.

The Commission correctly ruled as fact that this particular residential development is a commercial development which may substantially affect environment requiring compliance with the provisions of the Site Location Law.

*Constitutionality of the State's exercise of its police power under this Act.*

In enacting the Site Location Law, the 104th Legislature presented the State with a means of minimizing, through the exercise of its police power, the irreparable damage being done to the environment. But the mere urgency of the action taken cannot override the necessity that the device which the Legislature has chosen for the public protection is one which is constitutionally permitted. It is Lakesites' contention that the Legislature has not chosen such a device here.

■■ In our consideration of the validity of the Legislature's choice of legislation to accomplish its purpose we have in mind that all Acts of the Legislature are presumed to be constitutional, that this is a presumption of great strength and that the burden is on him who claims that the Act is unconstitutional to show its unconstitutionality. State v. Fantastic Fair, 158 Me. 450, 186 A.2d 352 (1961).

■ The State is permitted, of course, to exercise the police power for the protection of the public welfare, safety, order, morals and health. Prudential Insurance Company of America v. Insurance Commissioner, Me., 293 A.2d 529 (1972); York Harbor Village Corporation v. Libby, 126 Me. 537, 140 A. 382 (1928). It seems self-evident in these times of increased awareness of the relationship of the environment to human health and welfare that the state may act—if it acts properly—to conserve the quality of air, soil and water.

■ To do so the State may justifiably limit the use which some owners may make of their property. Our law has long recognized that a landowner holds his property subject to the limitation that he may not use it to the serious disadvantage of the public.

As early as 1835 the legislative body of the City of Bangor determined that the public safety demanded that wooden buildings should not be built in certain sections of the City and enacted an ordinance forbidding owners of land in these areas from erecting wooden buildings on their property. This Court upheld the constitutionality of the ordinance saying:

"Police regulations may forbid such a use, and such modifications, of private property, as would prove injurious to the citizens generally. This is one of the benefits which men derive from associating in communities. It may sometimes occasion an inconvenience to an individual; but he has a compensation, in participating in the general advantage. Laws of this character are unquestionably within the scope of the legislative power, without impairing any constitutional provision. It does not appropriate private property to public uses; but

merely regulates its enjoyment. . . . " Wadleigh v. Gilman, 12 Me. 403, 405 (1835).

In 1907 the very philosophy contained in the statement of purpose of the present Act was expressed by the Justices of this Court in an Opinion in which they responded to a question from the Maine Senate. The Senate inquired whether

"In order to promote the common welfare of the people of Maine by preventing or diminishing injurious droughts and freshets, and by protecting, preserving, and maintaining the natural water supply of the springs, streams, ponds, and lakes and of the land, and by preventing or diminishing injurious erosion of the land and the filling up of the rivers, ponds, and lakes, . . . " Questions and Answers, 103 Me. 506, 507, 69 A. 627 (1907).

the Legislature had power under the Constitution to pass legislation which would prohibit the owners of wildland from unnecessary cutting or destruction of small trees "to preserve or enhance the value of such lands and trees thereon and protect and promote the interests of such owners and the common welfare of the people". While the Opinion of the Justices is not precedent, we find that the reasoning which led to their conclusions is most impressive. The Justices found that the proposed legislation would not offend the constitutionally guaranteed right of "acquiring, possessing and defending property" or the provision that private property shall not be taken for public uses without just compensation. Constitution of Maine, Art. 1, §§ 1, 21. Six of the Justices answered,[10] quoting with approval the language of Chief Justice Shaw in Commonwealth v. Alger, 7 Cush. 53 (1851) :

" 'We think it a settled principle, growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property in this commonwealth, as well that in the interior as that bordering on tide waters, is derived directly or indirectly from the government and held subject to those general regulations which are necessary for the common good and general welfare. Rights of property like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the Legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient. . . .' " Questions and Answers, supra, 103 Me. at 510, 69 A. at 628–629.

The Maine Justices also quoted and relied upon the language of the Maryland Court in Windsor v. State, 103 Md. 611, 64 A. 288 (1906) :

" 'Property of every kind is held subject to those regulations which are necessary for the common good and general welfare. And the Legislature has the power to define the mode and manner in which one may use his property.' " Questions and Answers, supra, 103 Me. at 513, 69 A. at 630.

The Justices said :

"There are two reasons of great weight for applying this strict construction of the constitutional provision to property in land : 1st, such property is not the result of productive labor, but is derived solely from the State itself, the original owner; 2nd, the amount of land

---

10. The seventh declined to answer, deciding that a "solemn occasion" did not exist inasmuch as the Legislature had adjourned before the question could be answered. The eighth Justice did not participate.

being incapable of increase, if the owners of large tracts can waste them at will without State restriction, the State and its people may be helplessly impoverished and one great purpose of government defeated." Questions and Answers, supra, 103 Me. at 511, 69 A. at 629.

In York Harbor Village Corporation v. Libby, supra, this Court upheld the constitutionality of the statute which authorized village corporations to enact zoning ordinances and of the ordinance enacted under it. The Court followed the same reasoning as to the susceptibility of private property to restrictions upon its use necessitated by the public interest, saying:

"It is said that police power has not been, and perhaps cannot be, defined with precision. . . .

It is not the offspring of constitutions. It is older than any written constitution. It is the power which the states have not surrendered to the nation, and which by the Tenth Amendment were expressly reserved 'to the states, respectively, or to the people.'

Limitations expressed or necessarily implied in the Federal Constitution are the frontiers which the police power cannot pass. Within those frontiers its authority is recognized and respected by the Constitution and given effect by all courts.

We have seen that private property is held subject to the implied condition that it shall not be used for any purpose that injures or impairs the public health, morals, safety, order, or welfare. Under the police power, statutes and authorized ordinances give this condition practical effect by restrictions which regulate or prohibit such uses.

If the use is actually and substantially an injury or impairment of the public interest in any of its aspects above enumerated, a regulating or restraining statute or ordinance conforming thereto, if itself reasonable and not merely arbitrary, and not violative of any constitutional limitation, is valid. It is not a deprivation of property which the Constitution forbids, but an enforcement of a condition subject to which property is held." York Harbor Village Corporation v. Libby, supra, 126 Me. at 540, 541, 140 A. at 385, 386.

■■■■ We consider it indisputable that the limitation of use of property for the purpose of preserving from unreasonable destruction the quality of air, soil and water for the protection of the public health and welfare is within the police power.

*Constitutionality of application of the Act to one who only subdivides.*

Lakesites does not deny the power of the State to act properly under the police power to protect the environment but urges us that the application of the Act to one who merely subdivides is constitutionally forbidden. It argues that a remedial Act must be designed and applied rationally and reasonably to achieve the purposes for which the Act was devised. The evil to be avoided, the appellant contends, is the damaging impact of the development upon the environment and the impact occurs and the damage is sustained only with the construction and occupation of the premises— not when the land is only subdivided on plans and the lots are sold. Until such activity creating the impact occurs on the land, the Appellant argues, there is no burden or impact which can affect the environment and so the application of the Act to a mere subdivider as a prerequisite to his selling his land is not directly related to the Act's purpose.

■■■ It is true that the Act and its application under the police power must have a clear, real and substantial relation to the purpose of the Act.

" 'In order that a statute may be sustained as an exercise of the police power, the courts must be able to see that

the enactment has for its object the prevention of some offense or manifest evil or the preservation of the public health, safety, morals, or general welfare, that there is some clear, real, and substantial connection between the assumed purpose of the enactment and the actual provisions thereof, and that the latter do in some plain, appreciable, and appropriate manner tend toward the accomplishment of the object for which the power is exercised.'" State v. Union Oil Co. of Maine, 151 Me. 438, 447, 120 A.2d 708, 712 (1956), quoting from 16 C.J.S. Constitutional Law § 195, at 940.

 In our opinion such a connection between the purpose of the Act and its application to the subdivider is clear and reasonable. We have concluded earlier in this opinion that the Legislature intended to empower the Commission to prevent ecological damage before it occurs rather than to permit the occurrence of harm which can then be cured only at great public expense—if at all. It is not unreasonable to place upon the subdivider who plans the number, size and location of the lots to be offered for sale the responsibility for avoiding an inevitable large scale ecological calamity. The subdividing for sale is the first step in a commercial residential development and the Legislature reasonably concluded that the public welfare requires that control be exercised through the subdivider rather than attempting it through (in this case) 90 different purchasers whose properties can perhaps never at that later point—because of sheer weight and concentration of numbers—avoid environmental misadventure.

*Does the Act take Lakesites land without compensation?*

 We see no merit to the Lakesites' contention that the application of the Act to it is an unconstitutional taking of its land without compensation.[11] Nothing in the record indicates that the Act as applied constitutes such an unreasonable burden upon the property as would equal an uncompensated taking. State v. Johnson, Me., 265 A.2d 711 (1970); 16 Am.Jur.2d, Constitutional Law, § 294. In fact, the record demonstrates only that the Appellant's land cannot be sold for residential purposes while subdivided to the extent and in the manner Lakesites originally planned.

*Is the Act unconstitutionally vague and impossible of compliance?*

 The Appellant also argues that its land is being taken from it impermissibly because the criteria which the Act requires the landowner to meet is unconstitutionally vague and impossible of compliance.

Section 484 requires the Commission to approve a development proposal whenever it finds that:

"1. Financial capacity. The proposed development has the financial capacity and technical ability to meet state air and water pollution control standards, has made adequate provision for solid waste disposal, the control of offensive odors, and the securing and maintenance of sufficient and healthful water supplies.

2. Traffic movement. The proposed development has made adequate provision for loading, parking and traffic movement from the development area onto public roads.

3. No adverse affect on natural environment. The proposed development has made adequate provision for fitting itself harmoniously into the existing natural environment and will not adversely affect existing uses, scenic character, natural resources or property values in the municipality or in adjoining municipalities.

11. Constitution of the United States, Amendment V; Constitution of Maine, Art. I. § 21.

4. Soil types. The proposed development will be built on soil types which are suitable to the nature of the undertaking."

Lakesites protests that as it is only a subdivider it cannot accurately foresee the activity to be performed on the lots it sells and so cannot control the future adequacy of provisions relating to pollution control and maintenance of healthful water supplies. To be sure, the Act imposes upon the developer—including the mere subdivider—responsibilities which he has not had in the past. The Legislature has determined that an owner of a large tract of undeveloped land may no longer subdivide it, sell the lots and then walk away from the transaction indifferent to the local catastrophe that may result when construction and occupancy reveal the incapacity of the environment to withstand the impact of the development. It may be that this responsibility can more *easily* be met by a subdivider who is also a constructor of the buildings but it is equally the responsibility of the subdivider who chooses only to sell the bare lots. The duty is no doubt more burdensome as the land is less suitable and it may be impossible of compliance if the environment is of a type incapable of sustaining the proposed development. In the latter situation the public welfare demands that the land be used for another purpose or that the impact of the same use be diminished. In many situations the subdivider may be able to meet his burden of affirmatively demonstrating to the Commission that he has met the criteria through satisfactory conditions in his instruments of sale. We do not consider the burden to be unreasonable in view of the overriding public interest.

The New Hampshire Court expressed the same basic philosophy when it found that an ordinance which required approval of subdivision developments conditioned upon the developer's paying for street gradings and surfacing, curbings, sidewalks, water mains, sewers and other improvements did not impose an unreasonable burden upon a residential developer or amount to a taking of his land. The Court adopted the language of 2 Rathkopf, The Law of Zoning and Planning, ch. 71, § 9 (1960):

" 'Since the subdivision of a large tract of land into a number of small building lots and the development thereof, either for residential or industrial purposes increases the value of the land in the aggregate to the subdivider and at the same time imposes new burdens upon the municipality and, if uncontrolled, upon other elements in the community, the validity of imposing a duty upon the subdivider to comply with reasonable conditions relating to location, site plan, location of and width of roads and sidewalks, the installation of necessary storm drains and sewers, and to restrictions on lot sizes so that the subdivision will conform to the local requirements for the safety, health and general welfare of the subsequent owners of the individual lots therein and of the community has been generally recognized.' " Blevens v. City of Manchester, 103 N.H. 284, 170 A.2d 121, 122 (1961).

The Court added:

"The subdivision of land has a definite economic impact upon the municipality and hence the regulation of subdivision activities has been sustained as a means by which the interests of the public and the general taxpayer may be safeguarded and protected. Since the subdivider of land creates the need for local improvements which are of special benefit to the subdivision, it is considered reasonable that he should bear the cost rather than the municipality and the general taxpayer. . . ."

■ The Appellant concedes that the requirement that a proposed development must not be built on soil types which are unsuitable to the nature of the undertaking is a reasonable one, and we agree. We also feel that there can be no serious

question but that the Legislature may properly demand that adequate provision will be made for loading, parking and traffic movement and has done so clearly.

The requirement that the Commission must be satisfied that there will be no adverse effect upon the natural environment is the very substance of the Legislature's efforts to reduce despoilation of the environment to a minimum. While most such developments may be expected to "affect" the environment adversely to the extent that they add to the demands already made upon it, it is the *unreasonable* effect upon existing uses, scenic character and natural resources which the Legislature seeks to avoid by empowering the Commission to measure the nature and extent of the proposed use against the environment's capacity to tolerate the use.

█ Of course, the Legislature may not endow the Commission with a naked discretion and it has here established criteria to guide the Commission's exercise of its power.

While the Legislature has used general language in requiring proof that the proposed development has adequate provision for fitting itself harmoniously into the existing natural environment, the Legislature has throughout the Act pointed out the specific respects in which the development must not offend the public interest and in which the development would be ecologically inharmonious. The Act recognizes the public interest in the preservation of the environment because of its relationship to the quality of human life, and in insisting that the public's existing uses of the environment and its enjoyment of the scenic values and natural resources receive consideration, the Legislature used terms capable of being understood in the context of the entire bill. The Legislature has declared the public interest in preserving the environment from anything more than

minimal destruction to be superior to the owner's rights in the use of his land and has given the Commission adequate standards under which to carry out the legislative purpose.

█ For reasons not known to us the Act recites that *property values* also must not be (unreasonably) affected. In our opinion, the effect of developments upon property values is outside the scope and purposes of the Act and the Commission would be impermissibly applying the force of the State's police power in the enforcement of this Act if it denied approval of a development because of failure of proof that property values would not be adversely affected. We consider the addition of this dubious criterion constitutionally barred and void.

█ There appears no reason to believe that the Legislature, with its purpose of ecological protection appearing so clearly, would have felt that the provision as to property values was indispensable to the effectiveness of the Act. We consider the section to be severable and that the validity of the remainder of the Act is unaffected.[12]

The invalidity of this portion of the criteria has no effect upon the Commission's refusal to approve of the development. The Commission's findings make clear that the effect of Lakesites' development upon property values in Raymond, if any, did not influence the Commission's decision.

█ We have frequently held that the standards which a statute sets out to guide the determinations of administrative bodies must be sufficiently distinct so that the public may know what conduct is barred and so that the law will be administered according to the legislative will. The standards here are much more explicit than those which we found to be insufficient in Waterville Hotel Corp. v. Board of Zoning Appeals, Me., 241 A.2d 50 (1968) and those

12. In 1972 the Legislature, in Special Session during the pendency of this appeal, eliminated this condition as to property values from the statute. P.L. 1971, Special Session 1972, Ch. 613, § 5.

of which we approved in State v. Johnson, Me., 265 A.2d 711 (1970).

We find that the standards which the Act imposes upon the commission and the applicants are clear, explicit, rationally related to the purposes of the Act and are adequate guides for the conduct of both the Commission and the applicants.

*Does the Act deny the developer equal protection of the law?*

■ Finally, Lakesites argues that the Act denies a developer—and especially it —equal protection under the law. It argues that the subdivider of over 20 acres must receive the Commission's approval while the subdivider of under 20 acres faces no such requirements, and so it contends it is denied equal protection because size, it says, has no rational or reasonable correlation to the environmental impact. A 21 acre subdivision, it argues, may contain 5 residences while one of 19 acres may contain 19 residences. It is elementary that the Legislature may in its judgment create classifications so long as they are not arbitrary and are based upon actual differences in classes which differences bear a substantial rational relation to the public purpose sought to be accomplished by the statute. In re Milo Water Company, 128 Me. 531, 149 A. 299 (1930).

■ The purpose, as we have said, was to control the locations of those commercial and industrial developments which could substantially adversely affect the environment. The Legislature evidently concluded that the size of a development has a distinct relationship to the amount of its potential adverse impact upon the environment and concluded that at this time the public interest could best be served by applying the admittedly severe restrictions of the new law to large developments. The justification of the distinction as to size seems most clear in such legislation as this. For example, in an area with no municipal sewage disposal system, such as in Spring Valley Development, and where much of the soil has a high seasonal water table and is unsuitable for septic tank disposal of domestic sewage, the potential danger to the environment from the discharge of sewage from 90 residences must be greater than the discharge from 2 or from 19. Drawing the line at 20 acres is not a denial of equal protection. Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958); Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281 (1934).

"A state 'may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed. . . . if a class is deemed to present a conspicuous example of what the legislature seeks to prevent, the 14th Amendment allows it to be dealt with although otherwise and merely logically not distinguishable from others not embraced in the law'." Hall v. Geiger-Jones Co., 242 U.S. 539, 556–557, 37 S. Ct. 217, 223, 61 L.Ed. 480 (1917).

"When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the Legislature must be accepted unless we can say that it is very wide of any reasonable mark." Louisville Gas & Electric Co. v. Coleman, 277 U.S. 32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770, 775 (1927).

In *State v. King*, 135 Me. 5, 188 A. 775 (1936) we found no constitutional violation in the classification of carriers which demanded a certificate of public convenience and necessity or a permit to operate as a contract carrier of those carriers who operated beyond 15 miles of the point of receipt, quoting the language used by the United States Supreme Court in deciding a similar issue:

> " 'We think that the Legislature could properly take these distinctions into account, and that there was a reasonable basis for differentiation with respect to that class of operations. In this view, the question is simply whether the fixing of the radius at twenty-five miles is so entirely arbitrary as to be unconstitutional. It is obvious that the Legislature in setting up such a zone would have to draw the line somewhere, and unquestionably it had a broad discretion as to where the line should be drawn.' " Continental Baking Company v. Woodring, 286 U.S. 352, 370–371, 52 S.Ct. 595, 601, 76 L.Ed. 1155, 1166 (1931).

We see no irrational or arbitrary discrimination in the application of the Act to the large mere-subdivider. It is his act of subdividing that initially indicates the volume of the impact likely to fall upon the environment.

The distinction made by the Legislature does not appear to be unreasonable.

 In furtherance of its claim that it is denied equal protection, Lakesites contends that the statute would in effect authorize the Commission to create spot zones, administratively. The absence of a requirement of a comprehensive plan such as was demanded by the enabling statute which authorized municipalities to enact zoning ordinances,[13] Lakesites argues, results in piecemeal zoning with arbitrary distinctions.

While the Site Location Law bears a resemblance to zoning ordinances [14] in that both seek to restrict the use of land to areas appropriate for the purpose, the basic purposes of the two laws are distinguishable. We have said that the Legislature has authorized municipalities to adopt zoning ordinances

> ". . . as an integral part of a comprehensive plan for municipal development and promotion of the health, safety, and general welfare of its inhabitants. The geography, the economic and industrial development, the residential necessities, the nature and extent of residential, business and industrial growth of one municipality may be entirely different from those in another municipality." Wright v. Michaud, 160 Me. 164, 168, 200 A.2d 543, 545–546 (1964).

The *Wright* Court said also:

> "In considering the provisions of a comprehensive zoning ordinance the legislative body may take into consideration the nature and character of the community and of its proposed zone districts, the nature and trend of the growth of the community and that of surrounding municipalities, the areas of undeveloped property and such other factors that necessarily enter into a reasonable and well-balanced zoning ordinance." Wright v. Michaud, supra, 160 Me. at 173, 200 A.2d at 548.

 The Site Location Law on the other hand is not directed toward promoting an orderly community growth relating one area of a community to all other areas. It is not concerned with where a development takes place in general but only that the development takes place in a manner consistent with the needs of the public for a healthy environment. It did not grant the Commission the authority to determine where the location of a develop-

---

13. 30 M.R.S.A. § 4953, repealed P.L. 1971, ch. 455, § 3. The comprehensive plan is now required by 30 M.R.S.A. § 4962.

14. King Resources Co. v. Environmental Improvement Commission, Me., 270 A.2d 863, 868 (1970).

ment must be but rather it gave the Commission authority to measure the proposal and location against statutory standards and to apply reasonable terms and conditions which the proposal must meet in order that it may be "located in a manner which will have a minimal adverse impact on the natural environment". There is no constitutional necessity that the Commission be required to draw a comprehensive plan as part of the Site Location Law and the Legislature has not considered one to be essential to its purpose here, perhaps recognizing the difficulties which the preparation of such a plan relative to ecological problems would entail. The application of the Site Location Law on a case by case basis but under guidance of the explicit criteria of the statute is not in itself a denial of equal protection and there is no evidence that there has been such a denial to Lakesites.

We find that the application of the Act to Lakesites does not offend the provisions of either the state or federal constitutions.

■ A strong policy against piecemeal appellate review has been manifest in the decisions of this Court for many years. Hand v. Nickerson, 148 Me. 465, 467, 95 A. 2d 813, 815 (1953). The principle that only final judgments are ripe for appellate review was preserved in the structure of our Maine Civil Rules and interlocutory review is authorized only when ordered by a Justice in the Superior Court in exceptional situations.[15] The definition of final judgment as one which "fully decides and disposes of the whole cause leaving no further questions for the future consideration and judgment of the court" Gilpatrick v.

Glidden, 82 Me. 201, 203, 19 A. 166, 167 (1889) embraces our present problem.

The powers of the Environmental Improvement Commission are wholly statutory. King Resources Company v. Environmental Improvement Commission, supra. The authority to dispose of issues presented at hearing which the statute gives the Environmental Improvement Commission is to "make findings of fact and issue an order granting or denying permission . . . ."

The jurisdiction of the Law Court is also entirely statutory. 38 M.R.S.A. § 487 provides for an appeal direct to the Law Court from an *order* of the Commission. The statute states:

"The court shall decide whether the commission acted regularly and within the scope of its authority, and whether the order is supported by substantial evidence, and on the basis of such decision may enter judgment affirming or nullifying such determination."[16]

■ There is completely absent any statutory authority for the Commission to present an interlocutory appeal to the Law Court or for the Law Court to entertain direct appeals on a piecemeal basis.

Although Lakesites chose to confine its participation in the hearing to an attack on the Commission's jurisdiction and waived the right of cross-examination and of presentation of evidence, the Commission's order fully "decides and disposes of the whole cause" and leaves "no further questions for the future consideration and judgment" of the Commission as to the development as presently proposed by Lakesites.

15. M.R.C.P., Rule 72(c).
 An excellent discussion of the final, judgment rule is found in Field, McKusick and Wroth, Maine Civil Practice, 73.1–73.5.

16. Effective September 23, 1971 M.R.C.P., Rule 73 was amended by adding subsection (f) which now provides that an appeal from an order of the Environmental Improvement Commission to the Law Court shall be taken "in the same manner as an appeal from a judgment of the Superior Court in a civil action" except for the time period within which the appeal must be taken. This amendment supplies no authority for interlocutory review.

We find that the Commission acted regularly and within the scope of its authority and that its order is supported by substantial evidence.[17]

The Commission's [18] determination is affirmed and the appeal is denied.

---

17. While the informal presentation of the evidence together with the absence of objection by Lakesites resulted in the introduction of some testimony which was not properly presented, our examination of the record has convinced us that sufficient substantial, credible evidence was properly received to support the findings and order.

18. The Environmental Improvement Commission was renamed the Board of Environmental Protection by P.L. 1972, 1st Sp.Sess., ch. 618, § 12.