**In re BELGRADE SHORES, INC.**

Supreme Judicial Court of Maine.

March 29, 1977.

Sandy & Sandy by Robert E. Sandy, Jr., Waterville, for John P. Gawler and Everett P. Pope.

Gregory W. Sample, Asst. Atty. Gen., Augusta, for Dept. of Environmental Protection.

Marden, Dubord, Bernier & Chandler by Stephen Dubord, Alton C. Stevens, Waterville, for Belgrade Shores.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

WERNICK, Justice.

In this sequel to *In re Belgrade Shores, Inc.*, Me., 359 A.2d 59 (1976), John P. Gawler and Everett P. Pope have appealed to this Court from a decision of the Board of Environmental Protection [1] which approved, subject to conditions, the application of Belgrade Shores, Inc. (Belgrade) concerning a proposed residential subdivision on Hoyt's Island in Great Pond, Belgrade, Maine.

We deny the appeal.[2]

---

1. Direct appeal to this Court is authorized by Section 487 of the Site Location Law (38 M.R.S.A. §§ 481–488).

2. Because the appeal must be denied in any event we may here assume, without deciding, that appellants are "persons aggrieved" within the meaning of 38 M.R.S.A. § 487. We thus leave to another day the intricacies involved in the question how in a direct appeal to this Court from a Board proceeding in which there was no evidentiary hearing (see infra) a purported appellant can prove himself a "person aggrieved."

Belgrade's application to the Board was filed on July 9, 1975. It contemplated a subdivision into 57 unimproved lots, each accommodating two single-family dwellings. Pursuant to 38 M.R.S.A. § 483, the Board was authorized to decide on the application in three ways:—(1) approve it within 30 days, with or without "appropriate and reasonable" conditions; (2) disapprove it within 30 days; or (3) postpone decision on it pending a hearing conducted pursuant to 38 M.R.S.A. § 484. In this case, the Board elected to act without a hearing and grant approval on conditions. It did so on August 20, 1975.[3]

In granting conditional approval, the Board made findings of fact inducing it to require several modifications of Belgrade's original plan. First, the Board denied the application as to two of the 57 lots on grounds that they were unsuitable for on-site sewage disposal. Second, it prohibited construction of more than one single-family dwelling on each of the remaining lots without its "further approval." Third, the Board required that in the deeds conveying the lots there be inserted a covenant prohibiting erection of private "permanent" docks. Fourth, Belgrade was to develop plans for a common beach, docking facility and automobile parking area. These plans were to be submitted to the Board, and no lots were to be sold until the Board had received and approved the plans.

This appeal raises two basic issues:—first, whether, in accordance with the statutory criteria governing as to Board approval of an application under the Site Location Law, the Board may appropriately approve the "mere subdivision" of unimproved land; and second, on the assumption that such approval could be appropriate, whether in this instance the Board acted correctly in concluding that Belgrade's project would be in compliance provided particular conditions be met.

## I.

■ Appellants maintain that the Site Location Law does not contemplate Board approval of the mere subdivision and sale of lots which are unimproved. In their view such approval effects an impermissible "delegation" to lot buyers of the responsibility to comply with statutory requirements.

We reject this contention.

At bottom, appellants' position would interpret the Site Location Law to prohibit in all cases the sale of land as *unimproved* lots.[4] We find no such intent objectively manifested in the statutory scheme. On the contrary, specific legislative language and general legislative purpose indicate otherwise.

In 38 M.R.S.A. § 481 the Legislature empowered the Board to regulate the location of "developments substantially affecting local environment." That phrase is defined in § 482–2 to include "subdivisions." Section 482 also defines, in subsection 5, the word "subdivision" as

"the division of a parcel of land into 5 or more lots to be offered for sale or lease to the general public during any 5–year period. . . ."

Nowhere is it specified that such lots must be improved by the developer in order to meet the statutory definition of "subdivision" and receive Board approval.

In common meaning "subdivision" stands in contrast to "development" in that "subdivision" does not comprehend *improvement* of the divided parcel. Specifically in regard to real estate, the dictionary meaning of "subdivision" is

"a tract of land surveyed and divided into lots for purposes of sale—compare DEVELOPMENT." Webster's Third New

---

3. Appellants do not assign as error that the Board made this decision later than 30 days after Belgrade's application had been filed.

4. Certain subdivisions are, of course, entirely exempt from Board regulation under the Site Location Law depending on lot size, development acreage and the time span during which lots are to be offered for sale. 38 M.R.S.A. § 482–5.

International Dictionary of the English Language (1961)

"Development", in turn, is defined as

"a developed tract of land; *esp* : a subdivision having necessary utilities (as water, gas, electricity, roads)." Id.

Thus, by comparison to a "development", a "subdivision" consists of *unimproved* land.

■ We accept the normal import of the statutory language in the absence of legislative *manifestation to the contrary.* In re *Belgrade Shores, Inc.,* supra, at p. 63. We find none here.

Textually, § 482-5 indicates no intent to depart from the commonly understood definition of "subdivision" as pertaining to unimproved land.

Neither would the legislative purpose underlying the Site Location Law be furthered by a different interpretation. The purpose is revealed by the title of the law and express legislative findings in § 481. As stated therein, the problem sought to be solved was the adverse environmental impact of developments *in unsuitable locations.* Because relatively unfettered private choice of location had proved detrimental, future choices would be regulated by the Board. Additionally, the statutory scheme was to accomplish control of location by "flexible and practical means."

We find appellants' proffered construction of "subdivision"—requiring some improvement by the developer before sale—to be inconsistent with the above stated legislative purposes in two respects.

First, it is *location* that the Board supervises, not ongoing use. While the contemplated use must be determined in order to assess the suitability of the location, it does not follow that an applicant must have achieved a certain level of improvement to enable the Board to make that assessment. On the contrary, practical considerations often require that approval of location precede substantial investment in construction.

Second, the express concern that regulation be "flexible and practical" negates the categorical approach appellants urge. Some subdivisions may merit unconditional approval; others may necessitate the imposition of conditions, as here. It would hardly be "flexible and practical" to treat all subdivisions as prohibited in the absence of improvements such as appell⌐rt⌐ desire.

Our conclusion that the Board may approve the location of "mere subdivisions" accords with the rationale of In re *Spring Valley Development,* Me., 300 A.2d 736 (1973). In that case the subdivider contested Board authority to control the location of a contemplated "mere subdivision" on grounds that, after sale, the subdivider would have *no* power to ensure compliance with Board orders. We held that the Board had such authority and the means by which to achieve compliance.[5]

Although *Spring Valley* does not squarely decide the question whether the Board could approve subdivision of unimproved land, our handling of the issue there presented unequivocally demonstrates that we conceived the Board to have such authority. For example, in determining that the law was directed at the subdivider, rather than his vendees, we hypothesized

"if a subdivider has sold the lots to numerous individual purchasers each of whom, among other things, is to construct his own building, grade his own land, build his own driveway to the street, and provide for his own sanitary sewage disposal, there would be no one . . . who could be held responsible under the statute." In re *Spring Valley Development,* supra, at pp. 745, 746

In other words, the unimproved subdivision may be permitted *after it has been evaluated by the Board* so that the Board may have a control on future development by imposing on the subdivider responsibilities as the Board deems necessary.

---

**5.** In fact, the Board has adopted in this case our suggestion in *Spring Valley* that it ensure buyer compliance through insertion in the sub-

divider's deed of covenants effectuating Board orders. See: In re *Spring Valley Development,* Me., 300 A.2d 736, 750 (1973).

We therefore find no merit in appellants' contention that the Board erred by approving the sale of unimproved lots.

## II–A.

Having determined that mere subdivisions are not per se prohibited, we turn to appellants' complaints in regard to Board approval of this particular subdivision. In its first facet, this attack focuses on the imposition in the August 20, 1975 Board order of the conditions above described.

Appellants appear to contest both the authority of the Board to attach conditions to its approval of applications under the Site Location Law and its decision to do so here.

■ The simple answer to the first contention is that, as we earlier delineated, Section 483 expressly authorizes the Board to dispose of an application by approving it "upon such terms and conditions as are appropriate and reasonable."

■ We likewise find no merit in appellants' second contention, namely, that the Board erred by here granting conditional approval rather than denying Belgrade's application outright.

In addition to the express authority to impose conditions conveyed by § 483, § 481 mandates a "flexible and practical" approach to site regulation. A series of disapprovals pending the applicant's correction of deficiencies in its proposal would achieve the same effect as conditional approval. We therefore view the choice between those two methods as a question of semantics and, as such, fully within the Board's discretion under § 483. Further, we believe this conclusion consistent with the pragmatism espoused in § 481.

That the Board found non-compliance with two of the four criteria listed in § 484 [6] does not, as appellants claim, require disapproval. Such a result would be neither practical nor flexible where the non-compliance is minor, easily corrected, or both.

We find proper the conditional approach here adopted by the Board.

## II–B.

A second facet of appellants' attack on the granting of Belgrade's application is the claim that the evidence before the Board was insufficient to support the Board's findings regarding compliance.

■ Since there was no hearing, our review here is confined to the information contained in Belgrade's application and reasonable inferences drawn therefrom. 38 M.R.S.A. § 487; *In re Belgrade Shores, Inc.,* supra. Belgrade bore the burden below to demonstrate compliance with every statutory criterion. 38 M.R.S.A. § 484; *In Re Maine Clean Fuels, Inc.,* Me., 310 A.2d 736, 740 (1973). Our function is to determine whether the limited record before us contains substantial evidence to support Board's findings. *In Re Maine Clean Fuels, Inc.,* supra, at p. 757.

■ We decide it does.

The Board found that Belgrade met the statutory criterion in § 484–1 of "financial capacity and technical ability." [7] Concentrating on the "financial capacity" requirement, appellants argue that Belgrade's application provides no competent evidence to sustain such a finding. We disagree.

In answer to the application form's request for an estimated total cost of the project, Belgrade stated that it would incur no costs; instead, its grantees would undertake individual construction of cottages.

---

**6.** Section 484 requires that the Board approve a proposal whenever it finds that the developer has demonstrated (1) adequate financial and technical capacity, and provisions for solid waste disposal, odor control and water supply; (2) sufficient provision for traffic movement; (3) lack of adverse effect on the natural environment; and (4) suitability of soil types.

In this case the Board found non-compliance with the criteria numbered (2) and (3) as to the entire proposal, and attached conditions designed to achieve compliance. Additionally, it found two of the 57 lots did not meet the fourth criterion, soil suitability, and therefore denied the application as to those lots.

**7.** The four criteria of § 484 are listed in n. 6, supra.

The next question on the application form required Belgrade's assessment of its "financial capability to carry out the construction and operation of the proposed project." Consistent with the earlier information, Belgrade answered positively and added

"Belgrade Shores, Inc. has owned the land since 1958. Survey work has been done and paid for. There are no significant additional costs associated with the subdivision."

In other words, the "financial capacity" required in connection with this project was minimal. The developer owned the land, had paid for its survey, and intended no expensive alteration prior to sale. Income from sales would add to its financial stability.

Appellants object to this information, and the inferences therefrom, as "self-serving." In their view, the Board cannot base approval on the statements of the applicant but must investigate and require corroboration. While such a requirement might better assure compliance with the Site Location Law, we find that the Legislature has decided otherwise. In § 483 it expressly permitted approval of site location on the basis of the application, that is, without a hearing. In § 481, as we have heretofore noted, the Legislature made clear its wish that the Board pursue regulation by "flexible and practical means." We find no abuse in the Board's decision here to accept the application alone as proof of financial reliability in light of the minimal financial outlay contemplated.

The Board found, also in connection with § 484–1, that Belgrade had made adequate provision for solid waste disposal, the control of offensive odors, and a supply of healthful water. Belgrade's application form indicated that each lotowner would dispose of solid waste at the local municipal dump. As evidence of water supply, it cited the existence of "several excellent wells . . . on the island." The form contained no reference to the incidence or control of offensive odors.

Appellants attack the contemplated use by cottage owners of the municipal dump for solid waste disposal, arguing that the proposed island location renders insufficient resort to that mainland facility. While the subdivision's location does present special transportation problems in regard to solid waste, we conclude that those problems did not require the Board to decide, as a matter of law, that use of the town dump would be inadequate.

Appellants also quarrel with Board approval of the proposed supply of water through individual wells. While they do not question the truthfulness of Belgrade's assertion that wells producing healthful water already exist on Hoyt's Island, appellants assert that more information is needed:—the supply ultimately necessary should be estimated and explorations commenced to determine whether that supply will be available. Again, we conclude that the Board was not required to proceed as appellants desire. The application in question contemplated seasonal domestic use of water in an area where "several" wells were present. The inference that the use would not exhaust or contaminate the supply was reasonable.

In regard to "offensive odors", appellants claim that the Board's finding of compliance rested on a complete absence of evidence—the application was silent. Belgrade, according to appellants' argument, therefore failed to meet its burden of proof.

We disagree with appellants' premise that the application was silent. Appellants are correct that the form contains no express reference to the incidence or control of offensive odors. As the Board points out, however, residential developments do not produce such odors. It was therefore permissible to infer, from information in the application describing the project as residential, that there would be no offensive odors to control.

The Board, in accordance with § 484–2 and § 484–3, initially determined that Belgrade had not made adequate provision for traffic movement in the development area, and had failed to prevent adverse environmental impact. It concluded, however, that

Belgrade's submission of satisfactory plans for common docking and parking facilities would effect compliance with § 484–2. Appellants question the wisdom of common facilities, speculating that they will generate congestion. They also find the application's information insufficient to support the Board's conclusion that Hoyt's Island could accommodate such facilities.

The Board's election to require common parking and docking areas was clearly within its discretion. A single permanent dock reduces shoreline clutter and damage to the lake bottom.[8] Roads are freed of parked vehicles by the availability of parking facilities and this assists in promoting safe, efficient traffic movement.

As for the asserted insufficiency of the application in this regard, we again point out the reasonable inferences available to the Board. The application form states that the subdivision in question consisted of approximately 260 acres, including two miles of shoreline. It also cites existing parking possibilities on the mainland. It is surely a reasonable inference that a place for a common dock could be found along two miles of shoreline, and that one or more of the mainland parking possibilities would suffice. In any event, the conditional nature of the Board's approval precludes consummation of Belgrade's subdivision if the facilities prove unacceptable.

Lastly, citing general requirements of § 484, appellants attack alleged Board failures concerning sewage disposal. In their view, the Board erroneously relied on local controls to ensure adequate disposal. Further, it failed to require more than one test boring per lot when the state plumbing code recommends more extensive exploration.

Once again, appellants misconceive the Board's role under the Site Location Law. Nothing in that law prevents Board reliance on local supervision where appropriate. Such reliance appears particularly rea-

sonable where, as here, it concerns domestic plumbing problems familiar to every municipality. The Legislature has not suggested, as easily it could have, that a precondition of the Board's approval be a full evaluation of the requirements for compliance with the state plumbing code. Certainly, Belgrade's provision of test results as to each lot provided "substantial" evidence upon which to assess soil suitability.

As we pointed out in *Spring Valley,* the Legislature sought through the Site Location Law not to prevent increased demands on the environment but to avoid their *"unreasonable* effect upon existing uses, scenic character and natural resources . . . ." *In re Spring Valley Development,* supra, at p. 751

The Board order before us fully complies with the legislative mandate.

The entry is:

*Appeal denied.*

All Justices concurring.

---

**8.** The Board's decision to permit individual summer docks was not, as appellants urge, inconsistent with these goals. Seasonal facilities are less harmful to the lake bottom. More-

over, provision of a single permanent dock would tend to discourage individual investment in private temporary ones.