**In re RYERSON HILL SOLID WASTE DISPOSAL SITE—PARIS UTILITY DISTRICT, SOUTH PARIS, Maine.**

Supreme Judicial Court of Maine.

Nov. 7, 1977.

# 386 ■ ▬▬▬▬▬▬▬▬▬

Murray, Plumb & Murray by E. Stephen Murray, Portland, for intervenor Ryerson Hill Ass'n.

Cabanne Howard, Asst. Atty. Gen., Natural Resources Div., Augusta, for Bd. of Environmental Protection.

Theodore H. Kurtz, South Paris, for Paris Utility Dist.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

WERNICK, Justice.

In its "Findings of Fact and Order" dated November 12, 1975, the Maine Board of Environmental Protection approved, subject to specified conditions, the application of the Paris Utility District (hereinafter "Paris") for permission to construct and operate a sludge disposal dump on Ryerson Hill in South Paris. Pursuant to the Site Location of Development Law, 38 M.R.S.A. § 487 (1973 Supp.), the Ryerson Hill Association (hereinafter "Ryerson"), an Intervenor organization of Ryerson Hill property owners, brought this direct appeal from the Order of the Board. The points on appeal are: (1) the Board unlawfully imposed conditions on the Order of approval; (2) applicant Paris failed to demonstrate compliance with each statutory criterion of § 484 of the State Location of Development Law, and (3) the Board relied upon incompetent and prejudicial evidence.

We deny the appeal.

In 1973, Paris first applied for a permit to construct and operate a public wastewater treatment plant to process industrial and domestic waste in South Paris. On September 26, 1973, the Board approved the construction and operation of the wastewater treatment plant but denied a proposal to use a site owned by the A. C. Lawrence Co. tannery for disposal of the sludge.

With the wastewater treatment plant already operational, Paris in 1975 submitted an application for permission to develop an alternative site on the side of Ryerson Hill for the sludge disposal dump. The proposed disposal site is a remote 52 acre area located on the north side of Ryerson Hill in South Paris. The wastewater treatment plant eventually is expected to produce a residue of 1600 cubic feet of sludge per day for deposit on the Ryerson Hill site. The project will be the first in Maine for the trenching of sludge in which there is chromium, from the waste of a local tannery. Even though the chromium will not be in actually soluble form, the Board was induced by the presence of chromium and its potential solubility, coupled with the high level of ground water in the area of the proposed site, to give the application close scrutiny and to impose the specific conditions upon the grant of approval stated in the Board's Findings of Fact and Order.

Commonly associated with any land-fill project is the primary danger of a possible contamination of water either through surface water run-off carrying deposited pollutants or through leachate from waste filtering down through the soil and contaminating the ground water. Hence, here, as in any such land-fill project, the first step of the proposed project is drainage of the site's ground water and interception and diversion of both surface and ground water around the site. Once the site is completely dry, the sludge is to be encapsulated in strip trenches dug in the impervious fragipan that exists on the site between the surface soils and bedrock. After deposit of the sludge, the trenches will be reforested, the untouched wooded strips will become new trench sites and the process will be repeated.

Although finding that the proposed disposal method "generally incorporates known technology", the Board nevertheless imposed several express conditions upon its

grant of approval to the Ryerson Hill site because of the "untried nature of the proposal." The specified conditions include construction of an all-weather section of the site, construction of a sedimentation-retention basin to collect surface run-off and effluent from the drainage system, development of an intensive monitoring program by the applicant Paris under close supervision of the Department of Environmental Protection, submission of a detailed erosion control and reforestation plan, and production of affirmative on-site evidence of ability to lower and maintain the water table at an acceptable level prior to placement of the sludge and installation of permanent peripheral drains to maintain that capacity over time.

I.

In addressing Ryerson's first contention on appeal, that the Board acted unlawfully in imposing the above-described conditions upon the Order of approval, we commence with the Board's statement in its findings that the "record is limited" in many areas and that the "untried nature of the proposal dictates that maximum caution be exercised." Ryerson uses this statement as the basis of its contention that the Board acted unlawfully in imposing the above-described conditions. This shows, Ryerson argues, that the Board was aware that Paris, as an applicant, had failed to meet its burden of proof to come forward with a proposal adequately complying with the criteria requisite under § 484 of the Site Location of Development Law for the Board's approval and that, instead of rejecting the Paris proposal as thus deficient, the Board improperly assumed the burden, through the imposition of conditions, of transforming a deficient application into an adequate one.

We disagree with Ryerson's contention.

38 M.R.S.A. § 484 (1973 Supp.) expressly confers authority on the Board to approve an application

"upon such terms and conditions as the . . . [Board] may deem advisable to protect and preserve the environment and the public's health, safety and general welfare."

See also § 484. Recently, we made the point that careful use by the Board of this express authority to impose conditions can advance the general mandate in § 481 that the Board adopt a "flexible and practical" approach to site regulation. *In re Belgrade Shores, Inc.*, Me., 371 A.2d 413 (1977).

Considering the specific conditions here imposed by the Board we conclude that the Board did not exceed, or abuse, its authority.

■ Most of the conditions merely require the development of new or more detailed plans designed to safeguard the environment. As to these, the short answer to Ryerson's attack is, as we explained in *In re Belgrade Shores*, supra, that such conditional approval achieves the same effect as a series of disapprovals pending the correction of deficiencies in the proposal.

■ Others of the conditions, however, calling for development of an intensive monitoring program designed to provide assurance over the impact life of the project that reforestation is feasible and that all applicable water quality standards are met,[1] do go one step beyond those considered in *Belgrade Shores*. We reject Ryerson's suggestion, however, that in imposing the long-range monitoring condition the Board supplied necessary matter to enable Paris, as the applicant, adequately to discharge its burden of proof which, absent the condition, would not have been met. In approving the application for the sludge disposal site, the Board heard an abundance of expert testimony in five days of public hearings, after which it specifically found that the proposal "generally incorporates known technology" and that the applicant "complied with the requirements of 38 M.R.S.A. § 481 et seq."

---

1. The monitoring may continue even beyond the twenty years that it will take to fill the proposed site with sludge. The monitoring program will be conducted by the applicant under the close supervision of the Department and will occur at least bi-weekly for the first six months and thereafter at intervals as determined by the Board.

The Board thus made clear that Paris had established justification for the Board to grant the application without imposition of the enumerated conditions. That the Board saw fit, in an abundance of caution, to impose the monitoring conditions was a reasonable exercise of discretion by the Board in light of the untried nature of the project. The proposal before the Board was not routine; it presented a very specialized problem to which the Board responded, with a special environmental sensitivity, by attaching conditions closely tailored to protect the public health, safety and welfare. The monitoring conditions, which will not involve the Board in the day-to-day details of the disposal operation, were designed by the Board merely to ensure that the project does in fact work according to the plans outlined in the testimony presented to the Board. Resort to conditions for such purposes is plainly desirable to remove any hesitancy about embarking upon projects which are sound in theory but untried in practice. To require disapproval of them would be to ignore the substantial theoretical evidence of known technology and block future scientific advances.

We conclude that the approval of the Ryerson Hill site is in accord with the statutory directive that it serve to protect and preserve the natural environment and the public health, safety and welfare—especially in light of the environmental benefits and demands of the wastewater treatment plant, the untried nature of the disposal method, the on-site ground water level and the potentially dangerous presence of chromium in the sludge residue.

## II.

Having determined that the Board neither exceeded nor abused its authority in granting approval of the site permit subject to compliance with the conditions specified in the Board's Order, we turn to Ryerson's claim that there was inadequate evidence to establish compliance with the standards for approval delineated in § 484. Mindful that § 487 limits the scope of our review to an evaluation of ". . . whether the order is supported by substantial evidence", we

". . . 'search the entire record . . . to determine whether on the basis of all the testimony and exhibits before the agency it could fairly and reasonably find the facts as it did.'" *In re Maine Clean Fuels, Inc.*, Me., 310 A.2d 736, 741 (1973).

■ The record discloses substantial evidence in support of the Board's findings that the Paris proposal met all of the § 484 criteria.

■ Section 484, subd. 4 requires the applicant to demonstrate that

". . . [he] has . . . technical ability to meet state air and water pollution control standards, and has made adequate provision for solid waste disposal, . . . and the securing and maintenance of sufficient and healthful water supplies."

Paris presented detailed plans, and its engineers and on-site supervisor testified in further detail and were cross-examined extensively. Plainly, the Board's experience in dealing with such experts enabled it to conclude from the testimony that

"competent engineering and field operational personnel will be available at the required level and can adapt their training and experience to the job at hand."

That the Paris personnel had never constructed or operated a project like the one proposed does not mean that Paris lacks the necessary technical ability; otherwise, nothing new or "unique" could ever be approved by the Board.

■ The Board made an undisputed finding that the project will generate no solid waste of its own. The solid waste provision of § 484 subd. 1 is addressed primarily to the type of situation in which the prospective activity of the developer will generate its own solid waste on the site of development. In such a case, the Board must make a specific finding with regard to adequacy of provisions for solid waste disposal. Here, however, the whole purpose of the application is to obtain approval of certain arrangements for disposal of solid waste. In this special case, since there is no second-

ary generation of solid waste, the ultimate determination of the Board constitutes in itself the finding as to the adequacy of the developer's provision for solid waste disposal. No specific finding on the point was called for in the circumstances of this case.

■ The requirement of § 484 subd. 1 that the developer shall have made adequate provision for the securing and maintenance of sufficient and healthful water supplies is also addressed primarily to developments in which water is used on the site to be developed. By the very nature of the proposed Ryerson Hill development any concern for water supplies is identical to the concern for possible detrimental effect of the project on the neighboring water supply, addressed by the Commission under the § 484 subd. 1 requirement that the project not adversely affect the natural environment. It would serve no useful purpose to require the Board in a case like this to make a separate, similar finding with respect to water supplies under § 484 subd. 1.

In evaluating the impact of the project on the adjacent water supply, the Board made the judgment, in the face of conflicting testimony, that there would be no significant detrimental impact because of the buffer strip and the peripheral drainage system. Moreover, the only supply of water potentially affected is a single, seldom-used well of questionable water quality. In any event, as a precautionary response to Ryerson's concerns, the Board imposed a condition requiring that Paris assure the neighboring property owner an adequate supply of water for normal household use.

Ryerson next argues that Paris has not made adequate provision for traffic movement into and out of the project area, in violation of § 484 subd. 2. Again, however, we find substantial evidence in the record to support the Board's findings. The proposal calls for transportation from the treatment plant to the disposal site of five to nine truckloads per day of sludge enclosed in specially designed containers. The 23,000 lb. gross vehicle weight of each truckload is less than that of many vehicles presently using the proposed route. The route, designed to avoid the local village, would be along a public road presently accommodating a mixture of traffic, and, as the Board concluded, it is reasonable to anticipate that the proposed sludge disposal trucks will pose no significant problems as a distinct class of vehicles. Although severe snow storms may make the route inaccessible for periods of time, there is another, better quality, public road available for emergency use. In addition, the treatment plant has a four to five day holding capacity which, given proper priorities, should allow adequate time for clearing highways. In regard to on-site traffic the Board required as a condition of approval that the applicant design and maintain an all-weather section of the site for disposal during inclement weather.

Ryerson further contends that Paris has not demonstrated compliance with the requirements prescribed in § 484 subd. 3 of "adequate provision for fitting the development harmoniously into the existing natural environment" and for ensuring that the project "will not adversely affect existing uses, scenic character, or natural resources." Ryerson's argument focuses on alleged drainage of water from abutting property, the effect on natural watercourses, the likelihood of leachate entering surrounding watercourses, the nature of the sludge constituents, and the feasibility of reforestation.

Examination of each of these factors and the over-all effect of the project reveals a minimal adverse impact on the natural environment.

The issue concerning possible drainage from abutting property arose as a result of the testimony of Charles Berg, a mechanical engineer and neighboring property owner. As a counterweight to Berg's testimony, a soil scientist from the Maine Soil and Water Conservation Commission, (Kenneth Stratton), who otherwise had serious doubts about the project, stated that he was not concerned about desiccation of the immediate area. The reasonableness of the

Board's judgment cannot be disputed, given the resolution of the conflicting evidence in favor of the testimony of the disinterested State soil scientist. In addition, the Board concluded that

"no significant detrimental results will occur due to the buffer strips [of fifty feet] and peripheral drainage system."

Much of the testimony before the Board centered on the probable effect of the project on existing watercourses. In regard to the likelihood of leachate entering natural watercourses, there was considerable testimony that leaching would not occur. The proposal also contained a number of precautions designed to avoid leaching, including use of natural and disturbed fragipan material to limit movement and the establishment of a fifty-foot buffer zone. Because of the untried nature of the project, the Board, in addition to the intensive monitoring program, required construction of a retention basin to collect surface runoff and effluent from the drainage system.

The existence of chromium as a sludge constituent presents one of the most potentially dangerous aspects of the project. The testimony indicated, however, that the chromium is unlikely to have an adverse effect on the environment not only because of its solid and probable non-soluble state at any ph level expected on the site but also because of the existence of the fragipan filtering and the buffer zone. The retention basin and the monitoring program will also provide additional safety measures in this regard.

Relative to reforestation as an element of the § 484 subd. 3 criterion, Paris presented evidence that it would revegetate the area with the advice and assistance of experts from the Maine Forestry Department. As an added precaution, the Board required the applicant, prior to commencement of the sludge fill operations, to submit detailed plans for erosion control and reforestation.

Coupled with the monitoring program, this condition tends reasonably to assure the prevention of any adverse effect on the natural environment.

The final requirement of the Site Location Law provides that the development "be built on soil types which are suitable to the nature of the undertaking." § 484 subd. 4. With regard to the suitability of the soils, the Board found that although the on-site soil was unsuitable in its native state, the extensive drainage system would remove the major limitation of the soil classification. As the Board reasonably concluded, after removal of the high ground water table, the soil would have several "desirable characteristics" for a sludge dump, including the fragipan, layer and adequate fines to provide a filtering effect. Lastly, as a condition of approval, the Board required the applicant to employ a soil scientist to help finalize plans for the sludge disposal site.[2]

In short, Ryerson's argument that the Board's findings as to the statutory criteria of § 484 of the Site Location Law are not supported by substantial evidence—over and above the proposition already rejected ante (Part I) that the Board lacks power to impose conditions upon its grant of approval—is based on inferences from conflicting testimony contrary to those drawn by the Board. We cannot say that the Board acted unreasonably in resolving as it did, in the exercise of its own expertise, the conflicts in the expert testimony.

### III.

Ryerson's last claim on appeal that the Board relied upon incompetent and prejudicial evidence centers on two evidentiary matters: the Board's alleged unlawful consideration of "alternative sites", and the Board's alleged reliance on testimony in written form not subject to cross-examination in violation of the Board's "Regulations for Hearings on Application." (Rule 20.-6(c)(4)).

2. Much of Ryerson's soil quality argument relates to alleged non-compliance with guidelines developed in California and by the University of Maine. The Board apparently did not consider these guidelines since they lack the force of law. The controlling guidelines are those found in § 484 of the Site Location Law.

As to alleged reliance by the Board on testimony concerning alternative sites, first, the Board's order specifically disclaimed such reliance, stating:

"the Board's interpretation of its authority precluded the consideration of alternative disposal methods or sites."

Second, the Board in other respects merely observed—without indicating reliance thereon—that Paris engineers investigated other sites and that one site (the temporary site now in use) might qualify for an extension of the temporary operating permit until the Ryerson Hill site becomes operational.

Ryerson's contention that the Board utilized testimony in written form which was not subject to cross-examination is directed to the following circumstances. The Board admitted in evidence the written permit application which contained references to other sites investigated by Paris, and it refused Ryerson's request to strike such references from the application. In addition, the Board did not permit Ryerson to cross-examine or to testify as to alternative sites or methods, although one Board member had asked several questions concerning alternative sites.

■ These circumstances do not warrant appellant reversal of the Board's order. Balancing these circumstances against the Board's express denial of reliance on evidence concerning alternative sites, we conclude that Ryerson has failed to meet the affirmative burden reposing on it as an appellant to show prejudice. As this Court has previously made clear:

"When . . . review of the record reveals reliable, probative evidence in support of the agency findings and conclusions, the fact that irrelevant or incompetent evidence was admitted by the commission does not amount to reversible error. . . . Only when the agency is shown to have relied upon incompetent evidence to the prejudice of the complaining party can the admission of such evidence require reversal of the agency decision." *In re Maine Clean Fuels, Inc.*, Me., 310 A.2d 736, 749 (1973).

It has already been shown that the record contains substantial, competent evidence to support the affirmative findings on each of the statutory criteria. Ryerson's collection of scattered references in the record concerning alternative sites is not sufficient to establish on appeal that the Board relied on such evidence in a manner prejudicial to Ryerson's interests.

■ Similarly, we find no ground for reversal of the Board's Order in Ryerson's claim that the Board relied upon written testimony not subject to cross-examination, thereby violating its own regulations. The disputed written testimony consisted of a memorandum summarizing a letter from Dr. Dean Urie stating that reforestation of the filled trenches was feasible under certain conditions. The Board admitted the letter over objection, suggesting that it might possibly have some "slight value."

■ As indicated above, however, the mere admission of incompetent evidence by an administrative agency does not relieve an appellant of its burden to show prejudice. The testimony revealed that the Maine Forestry Department agreed to plant trees once a year at the site. Moreover, the Board expressly conditioned its grant of approval on submission of a "detailed erosion control plan, including plans . . . for reforestation." Lastly, the amount of site clearing at any one time will be quite limited and can be stopped if the monitoring reveals that the program is not fulfilling expectations. In light of all the circumstances the Board's action in relation to Dr. Urie's letter does not warrant our reversal of the Board's Order.

"Such a result would be neither practical nor flexible where the non-compliance is minor, easily corrected, or both." *In re Belgrade Shores, Inc.*, Me., 371 A.2d 413, 416 (1977).

The entry is:

*Appeal denied; the Board's approval of the application of the Paris Utility District is affirmed.*

**392** ▮ ▮

DUFRESNE, A. R. J., sat at oral argument as Chief Justice, but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.

All Justices concurring.