**SECURE ENVIRONMENTS, INC.**

v.

**TOWN OF NORRIDGEWOCK.**

Supreme Judicial Court of Maine.

Argued March 9, 1988.
Decided July 27, 1988.

Daniel M. Snow, Daniel E. Boxer (orally), Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for plaintiff.

Donald E. Eames (orally), Eames, Sterns & Washburn, Skowhegan, for defendant.

Before McKUSICK, C.J., and NICHOLS,* ROBERTS, GLASSMAN, SCOLNIK, and CLIFFORD, JJ.

GLASSMAN, Justice.

The plaintiff, Secure Environments, Inc. ("SEI") appeals from the judgment of the Superior Court, Somerset County, denying its appeal, pursuant to M.R.Civ.P. 80B, from a decision of the Town of Norridgewock Board of Selectmen ("the Board") denying SEI's application for a landfill permit. SEI contends that portions of Chapter 2, section 3 of the Norridgewock Ordinance are unconstitutionally vague, that SEI was denied procedural due process and the Board's decision was not supported by substantial evidence. For the reasons hereinafter set forth, we affirm the judgment.

## I.

On May 16, 1986, SEI, a Maine corporation, filed an application with the Town of Norridgewock for a permit to construct and operate a secure landfill on property it owns in the Town. This application was made pursuant to the Town's landfill ordinance (the "Ordinance"). A public hearing on SEI's application was held before the Board on July 10, 1986. The Board denied the application on July 14, 1986. The Board's decision appears to have been largely based on the insufficiency of information regarding specific concerns raised by the Board and members of the public.

SEI submitted a second application with additional information on August 6, 1986. The Town passed a landfill moratorium ordinance on August 7, 1986, but apparently the second SEI application was deemed outside its purview. A public hearing was held before the Board on the second application on September 24, 1986. The Board denied the application on September 29, 1986. Basing its denial on three of the criteria in the Ordinance, the Board found that: (1) SEI had not conducted sufficient test-borings on the site to determine if ground water will be "adversely affected" by the landfill; (2) SEI had failed to show

financial capacity to develop and close the landfill; (3) vehicles entering and leaving the landfill site could create a traffic hazard.

SEI filed this appeal in the Superior Court on October 29, 1986. The Superior Court concluded that the Board's decision and the Ordinance constituted a reasonable exercise of the Town's police power and denied the appeal. This appeal followed.

## II.

■ SEI's first contention on appeal is that certain portions of the Ordinance are impermissibly vague, and thus represent an unconstitutional delegation of legislative authority to the Board. The disputed section of the Ordinance, Chapter 2, section 3, reads, in relevant part, as follows:

*Section 3. Criteria for Granting the Permit.*

(a) A permit shall be granted after public hearing, provided the Selectmen find that:

i) the operator has adequate technical and financial capacity to properly construct, operate, maintain and close the disposal facility....

ii) the soils, bedrock formation and ground contours are such that the ground water and surrounding surface waters will not be adversely affected....

....

v) the site and entrance thereto will be properly landscaped to screen, to the maximum extent possible, the disposal area from all surrounding property, and that the entrance to the site will be controlled to prevent accident and public harm....

The specific portions of the Ordinance SEI finds objectionable are the requirements that "adequate" technical and financial capacity to "properly" construct, operate, maintain and close a facility be demonstrated; that soil and groundwater "not be adversely affected," and that "the entrance

---

* Nichols, J., sat at oral argument and participated in the initial conference but retired before this opinion was adopted.

to the site ... be controlled to prevent accident and public harm." SEI argues that the terms "adequate", "properly", and "adversely affected" effectively give the Board unbridled legislative discretion to grant or deny the application. In particular, SEI relies on *Wakelin v. Town of Yarmouth*, 523 A.2d 575 (Me.1987), and *Cope v. Inhabitants of Town of Brunswick*, 464 A.2d 223 (Me.1983), in support of its position. We disagree.

Prior to 1987, section 1304–B(3) of the Maine Hazardous Waste, Septage and Solid Management Act, 38 M.R.S.A. §§ 1301 to 1310–V (1978 & Pamph.1987), provided:[1]

> This chapter shall not be construed as limiting the authority of any municipality to enact ordinances for the regulation of solid waste or septage disposal, provided that these ordinances are not less stringent than or inconsistent with this chapter or the regulations adopted under this chapter.[2]

38 M.R.S.A. § 1304–B (Pamph.1986). Under the authority of 38 M.R.S.A. § 1304, the Board of Environmental Protection (BEP) revised the February 1, 1976 Solid Waste Management Regulations, effective December 5, 1983. Chapter 401 of the regulations recites that the Site Location of Development Act is the principal regulatory mechanism for the review of new landfill disposal facilities that substantially affect the environment.

We have twice addressed and rejected the specific challenge that the criteria established by 38 M.R.S.A. § 484 of the Site Location of Development Act are impermissibly vague,[3] and thus an unconstitutional delegation of legislative authority. *In re Spring Valley Development*, 300 A.2d 736 (Me.1973); *In re Maine Clean Fuels, Inc.*, 310 A.2d 736 (Me.1973). A comparison of those challenged criteria and the criteria set forth in chapter 2, section 3 of the Norridgewock ordinance in issue persuades us that the instant ordinance is "not less stringent or inconsistent with [the] chapter or the regulations adopted under [the] chapter" governing the issuance of a permit for the installation of a landfill disposal facility. The Norridgewock ordinance conforms to state and federal requirements and is a reasonable exercise of the Town's power to enact measures that require the applicant to meet certain requirements in order to protect the public and enhance and maintain the quality of the environment.

---

1. We note that in 1987 the Legislature by P.L. 1987, ch. 517, § 25, added section 1310–U which prohibits municipalities from enacting stricter standards than those contained in this chapter and the rules adopted pursuant thereto and allows the municipality, under the municipal home rule authority, to enact ordinances with respect to solid waste facilities which contains such standards as the municipality finds reasonable. *See* 38 M.R.S.A. § 1310–U (Pamph.1987). At the same time, P.L.1987, ch. 517 amended section 1304–B(3) to read as follows:

   This chapter shall not be construed as limiting the authority of any municipality to enact ordinances for the regulation of solid waste or septage disposal, provided that these ordinances are not less stringent than or inconsistent with section 1310–U or other provisions of this chapter or the rules adopted under this chapter.

2. Section 1304 provided for the adoption of rules by the Board of Environmental Protection, including, *inter alia*, a rule requiring compliance with the Site Location of Development Act, 38 M.R.S.A. §§ 481–488, (1978 & Pamph.1987) as a prerequisite to the location, establishment, construction, alteration or operation of any waste facility. 38 M.R.S.A. § 1304(2).

3. The pertinent part of the challenged criteria provided in section 484 is as follows:

   The board shall approve a development proposal whenever it finds that:
   **1. Financial capacity.** The developer has the financial capacity and technical ability to meet state air and water pollution control standards, and has made adequate provision for solid waste disposal, the control of offensive odors, and the securing and maintenance of sufficient and healthful water supplies;
   **2. Traffic movement.** The developer has made adequate provision for traffic movement of all types out of or into the development area;
   . . . .
   **4. Soil types.** The proposed development will be built on soil types which are suitable to the nature of the undertaking.

   By P.L.1981, ch. 449, § 8, subsection 5 was added, which provides, "**5. Ground water.** The proposed development will not pose an unreasonable risk that a discharge to a significant ground water acquifier will occur," and by P.L. 1983, ch. 513, § 3, amended subsection 2 to substitute the words "into, out of or within" for "out of or into."

Neither our decision in *Wakelin v. Town of Yarmouth,* 523 A.2d 575 (Me.1987), nor our decision in *Cope v. Town of Brunswick,* 464 A.2d 223 (Me.1983), leads to the conclusion that the ordinance in this case is unconstitutionally vague. The ordinance at issue in *Wakelin* provided that an applicant could obtain approval for a special exception only if the Zoning Board of Appeals (ZBA) determined that a proposed use would be "compatible with existing uses in the neighborhood, with respect to physical size, visual impact, intensity of use, proximity to other structures and density of development." The applicant had been denied a permit for failure to comply with the required "intensity of use" and "density of development" set forth in the ordinance. We concluded that this language constituted an impermissibly vague delegation of authority because it contained no qualitative standards by which the Board would be guided: "[f]rom the ordinance an applicant cannot even tell whether compatability with his project's surroundings requires the same intensity of use and density of development, or less, or more. *Such uncertainty is impermissible.*" *Wakelin,* 523 A.2d at 577 (emphasis added). As we said further in *Wakelin, id.,* "the Board can roam at large in policy-making [and] on each application ... is free to express a legislative-type opinion about what is appropriate for the community." Because it was totally within the ZBA's unlimited discretion as to whether the intensity of use and density of development was compatible with the neighborhood, the ZBA's decision was unreviewable.

In *Cope,* the ordinance provided that an application for a special exception would be approved only if a proposed use would not "adversely affect the health, safety or general welfare of the public." It was not the presence of the term "adversely" which we concluded rendered this provision unconstitutionally vague; rather it was the fact that the broad language "affect the health,

safety and general welfare of the public" gave the ZBA unlimited discretion to determine whether a proposed use would in some way affect the public's well-being in a manner that could not be anticipated by the applicant. What is required by "the health, safety or general welfare of the public" is a legislative decision that must be made by the municipality's legislative authority and not by a municipal administrative board.

In interpreting the Norridgewock ordinance at issue in the instant case, the Board is primarily concerned with implementing the legislative intent set forth in section 1302 of the Solid Waste Management Act that the proposed facility meet statutory and regulatory standards in order to protect the well-being of the public by "conserv[ing] natural resources and prevent[ing] water, air and land pollution." In order to do so the legislature declared it to be of the highest priority that an "economic, efficient and environmentally sound method of waste recycling and disposal" be utilized. In determining whether the ordinance in question contains sufficient qualitative standards to limit the Board's discretion in achieving that intent, the question we must address is *not* whether the Town, if it chose to do so, could provide the applicants with more specific standards, rather the question before us is whether the standards enacted by the Town contain sufficient guidelines to pass constitutional muster. We conclude, that unlike the ordinances in question in *Wakelin* and *Cope,* the ordinance in the instant case contains such guidelines.[4]

In *Spring Valley,* where we upheld language almost identical to that at issue here, we pointed out that in determining whether an enabling statute provides adequate guidance to those entrusted with carrying out its provisions, we look to the entire statutory scheme rather than focusing on the general language of individual provisions. *See also Northeast Occupational Exchange, Inc. v. State,* 540 A.2d

---

4. We have recognized that although it is preferable to enact detailed provisions that apprise the applicant of precisely what evidence must be presented to a municipal board or administrative agency, the reality is that effective regulation in some instances "requires a flexibility and attention to changing technology which are incompatible with more detailed standards...." *See Lewis v. State Dep't of Human Services,* 433 A.2d 743, 749 (Me.1981).

1115 (Me.1988) (in order to determine what is meant by "adequate," look to entire regulation). In this case, the Board is required to determine whether the applicant has demonstrated that ground and surface waters will not be "adversely affected," that the entrance to a site will be "controlled to prevent accident and public harm," and that it has "adequate technical and financial capacity." In order to determine whether the Board has been given constitutionally sufficient guidance in carrying out its duties, we must determine whether these terms are "capable of being understood in the context of the entire [ordinance]." *Spring Valley*, 300 A.2d at 751.

In making the determination as to whether ground or surface water will be "adversely affected" the Board is guided by chapter 1, section 2 of the Norridgewock ordinance which states that the disposal of solid waste is to be carried out in a manner that prevents "the pollution of ... water resources of the town," as well as "adverse impacts upon private wells." Chapter 2, section 3 also provides that the applicant will take measures to "minimize erosion and prevent sediment pollution or siltation of any ground or surface water in the town" and that "[a]dequate provision has been made to monitor the site against surface and ground water contamination." With respect to the requirement that the applicant show that the site will be controlled to prevent accident and public harm, to the extent that it is necessary to provide any clearer guidance than the words themselves, chapter 2, section 2 of the ordinance provides that the type of concerns to be considered by the Board is "the manner and frequency in which and the routes by which material will be transported to the site," and chapter 1, section 2 provides that the waste disposal site should be developed in a manner that prevents "unreasonable burdens being placed upon the town roads and traffic conditions." Finally, the requirement that the applicant demonstrate that it has "adequate technical and financial capacity," must be read in the context

of the purpose of the ordinance which is to ensure that the operator has the ability to construct, operate, maintain and close a facility that utilizes appropriate technology in light of the site of the facility to ensure that the surrounding environment will not be subject to harmful pollutants, either during the operation or after the closing of the facility.

We conclude, as we did in *Spring Valley*, 300 A.2d at 751, as authorized by the Legislature, "[t]he [legislative body of the Town] has declared the public interest in preserving the environment from anything more than minimal destruction to be superior to the owner's right in the use of his land and has given the [Board] adequate standards under which to carry out the legislative purpose." At the same time, these standards contain sufficient guidelines to allow for effective judicial review and thus protect the applicant against arbitrary action by the Board. *See City of Biddeford v. Biddeford Teachers Ass'n*, 304 A.2d 387 (Me.1973).

### III.

■ SEI also contends that it was denied due process [5] at the hearing before the Board on September 24, 1986. Specifically, SEI argues that (1) because of the vague language of the Ordinance and the Board's refusal to grant a reasonable time for the submission of additional information after the hearing, it was denied an opportunity to be heard, (2) the Board did not act in good faith, in that it hurriedly denied SEI's second application only several days after the hearing, and (3) SEI was denied its right to cross-examine adverse expert witnesses hired by the Town, since SEI was not notified of the identities of expert witnesses the Town and the Board would be calling until the day of the hearing.

What process is due will vary from case to case. In general, "Whether tested by article I, section 6–A of the Maine Constitution or by its federal counterpart, due process is not a static concept; rather, its requirements vary to assure the basic fairness of each particular action according to

**5.** SEI appears to base its argument on procedural, not substantive, due process concerns.

its circumstances." *In re Jo–Nell C.*, 493 A.2d 1053, 1055 (Me.1985). SEI's right to use its property is an interest protected by the federal, and, by analogy, the State due process clauses. *Barbian v. Panagis*, 694 F.2d 476, 483 (7th Cir.1982). The practical inquiry to be made here is whether the procedure followed by the Board struck a fair balance between the competing interests of the private party (SEI) and the government (the Town). *See In re Jo–Nell C.*, 493 A.2d at 1055; *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434, 102 S.Ct. 1148, 1157, 71 L.Ed.2d 265 (1982); *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976).

We have stated, "It is essential to a party's right to procedural due process that he be given notice of and an opportunity to be heard at proceedings in which his property rights are at stake." *Mutton Hill Estates, Inc. v. Town of Oakland*, 468 A.2d 989, 992 (Me.1983).

Here, SEI was afforded notice of and an opportunity to be heard at a public hearing on its application. The Board allowed SEI to submit additional information for a period of several days after the hearing; we cannot characterize this as an unreasonable period of time. SEI's allegation of a lack of good faith with respect to the Board's expeditious decision is unfounded. There is nothing in the record to indicate that the Board's swift rendition of its decision was motivated by animosity towards SEI or was the result of any failure to deliberate fully on the matter.

■ Finally, SEI's argument regarding cross-examination is also without merit. The experts retained by the Town testified at both the July and September hearings. SEI was well-acquainted with their views before the September hearing, based on their testimony at the July hearing and reports they had written for the Town prior to the July hearing. The testimony of the experts did not change substantially from the July to the September hearing, and the new reports they wrote prior to the September hearing did not vary significantly from their earlier reports. Although SEI

did object to being given a copy of one expert's second report only minutes before the September hearing, SEI did not expressly object to the conditions of cross-examination at that hearing. In these circumstances, SEI was not denied an opportunity to cross-examine the experts in a meaningful way. Moreover, a review of the hearing transcript shows that SEI's counsel and experts conducted a vigorous and extensive cross-examination of the Town's experts. Accordingly, we find SEI's due process objections to be unavailing.

### IV.

■ As the final basis for its appeal, SEI contends that the Board's decision was not supported by substantial evidence on the record. When, as here, the Superior Court has acted as an intermediate appellate court, we directly review the Board's findings. Those findings must stand if there is substantial evidence on the record to support them, the Board's conclusions were reasonable, and no errors of law were made. *Sebasticook Valley Health Care Facility v. State*, 484 A.2d 595, 599 (Me. 1984).

SEI argues that there was not substantial evidence on the record to support the Board's finding that SEI had conducted an insufficient number of borings to confirm that the landfill would have no adverse effect on groundwater. At the hearing before the Board, one of SEI's experts concluded that, based on the data collected from the test borings that had been done, the landfill would have no adverse impact on the surrounding groundwater. However, the Town's experts concluded that more test borings should have been performed. One expert opined that one boring per acre, with each boring 10–15 feet into the bedrock, would have been an adequate number of test borings.[6] The Town's other expert also expressed a belief that SEI had not collected a sufficient amount of hydrogeological data to show that the landfill would not have an adverse impact on the

6. There were 11 borings actually done on the 35-acre site.

groundwater. Essentially, this situation amounted to a difference of opinion between SEI's experts and the Town's experts, and the Board chose to believe the Town's experts. After a careful review of the record, we conclude that the Board did not act unreasonably in finding the Town's experts more credible.

■ SEI also challenges the Board's finding that there was insufficient proof that SEI had the financial capacity to construct, operate, maintain and close the landfill. The landfill's estimated cost was 11.7 million dollars. SEI's funding would come from the Ipswich (Mass.) Savings Bank, in the form of a 10.5 million dollar loan, and Paul Quinn, an otherwise unidentified investor, who promised to invest 1 million dollars in the project. Thus, the 11.7 million dollar project had an initial capitalization of only 11.5 million dollars. SEI proposed to cover closure costs for the project by establishing an irrevocable escrow account with a reputable bank. SEI proposed to fund this account from its anticipated profits. On the whole, SEI's financial plans were not stated with great certainty. At the September hearing, SEI's president stated his position to be: "[W]e will cover costs, it's as simple as that." Considering the uncertain nature of SEI's financial plans, it was not unreasonable for the Board to conclude that SEI did not show that it had the financial capacity to develop *and* close its proposed landfill.

SEI's final argument is that the Board did not have substantial evidence to support its finding that vehicles entering and leaving the site could create a traffic hazard. SEI appears to be correct on this issue. However, because we conclude there exists substantial evidence on the record to support the Board's ultimate decision, we affirm the Board's denial of SEI's application.

The entry is:

Judgment affirmed.

McKUSICK, C.J., and ROBERTS and CLIFFORD, JJ., concur.

SCOLNIK, Justice, dissenting.

I respectfully dissent.

I conclude that this case is governed by our decisions in *Wakelin v. Town of Yarmouth*, 523 A.2d 575 (Me.1987) and *Cope v. Inhabitants of the Town of Brunswick*, 464 A.2d 223 (Me.1983), and not by the earlier cases of *In re Maine Clean Fuels, Inc.*, 310 A.2d 736 (Me.1973), and *In re Spring Valley Development*, 300 A.2d 736 (Me.1973), on which the court so heavily relies. I therefore further conclude that the challenged provisions of the Norridgewock Ordinance constitute an impermissibly vague delegation of a town's legislative authority to the Board of Selectmen.

*Wakelin* and *Cope*, which the court does not confront in depth, more specifically dealt with the issue now before us, namely the validity of a municipal ordinance in the face of a standardless delegation challenge. In *Wakelin*, decided only last year, we found the particular standards set forth in a municipal ordinance as a guide to the zoning board of appeals ("ZBA") to be impermissibly vague. The ordinance in question allowed a special exception provided the ZBA determined, *inter alia*, that:

> The proposed use will be compatible with existing uses in the neighborhood, with respect to physical size, visual impact, intensity of use, proximity to other structures and density of development.

We concluded that the terms "intensity of use" and "density of development" were not sufficiently specific standards to guide either an applicant for a special exception or the ZBA. We stated that an applicant for an exception must receive an answer to the question, " 'What facts must I present to gain the Board's approval?' " *Wakelin*, 523 A.2d at 577. An appropriate answer to this question was characterized in *Wakelin* as consisting of "quantitative standards" that would transform the vague, "unmeasured" language in the ordinance into "specific criteria objectively useable by both the Board and the applicant." *Id.*

In *Cope*, a zoning ordinance empowered the local ZBA to grant special exceptions if an applicant proved, *inter alia*, that a proposed use would not "adversely affect the

health, safety or general welfare of the public" and would not "alter the essential characteristics of the surrounding property." We found these standards to be fatally imprecise, as they permitted "broad legislative judgment to be delegated to the [ZBA]." *Cope*, 464 A.2d at 227.

Our holdings in both cases were premised on the principle that legislative power may not be delegated from the legislature to the municipality or from the municipality to a local administrative body without a sufficiently detailed statement of policy to: "furnish a guide which will enable those to whom the law is to be applied to reasonably determine their rights thereunder, and so that the determination of those rights will not be left to the purely arbitrary discretion of the administrator."

*Cope*, 464 A.2d at 225, (quoting *Stucki v. Plavin*, 291 A.2d 508, 510 (Me.1972)). This principle is derived from constitutional requirements of equal protection and due process. *See Wakelin*, 523 A.2d at 577 (equal protection); *Superintending School Committee of the City of Bangor v. Bangor Educational Association*, 433 A.2d 383, 386 n. 4 (Me.1981) (due process).[1]

Applying the analysis we employed in *Wakelin* and *Cope* to the present case, the conclusion is inescapable that the Norridgewock Ordinance constitutes an impermissibly vague delegation of the Town's legislative authority to the Board of Selectmen. As drawn, the Ordinance's standards applied by the Board in this case do not advise with sufficient clarity "[w]hat facts must [be presented] to gain the Board's approval?" *Wakelin*, 523 A.2d at 577. Moreover, such a lack of specific standards permits the Board to go beyond its proper quasi-judicial function.

Although the court adverts to *Wakelin* and *Cope* in its opinion, its treatment of these cases is rather incomplete. No mean-

ingful distinction is detectable between the ordinance language we struck down in *Wakelin* and the language at issue in this case. Both ordinances share the absence of the quantitative standards required to channel and limit the decision-making authority of municipal boards. The court's opinion, however, does not distinguish *Wakelin* from, or harmonize it with, the present case.

Moreover, the court is unable to distinguish the present case from *Cope*. There is no basis for the court's position that the *Cope* court intended to consider only the phrase "affect the health, safety or general welfare of the public," and not the entire standard challenged as impermissibly vague in that case, namely, "*adversely* affect the health, safety or general welfare of the public." The court cannot point to any functional difference between the ordinance language we found deficient in *Cope*, and the requirement here that a proposed landfill not "adversely" affect surface or ground water. In sum, without the unjustifiable exclusion of the word "adversely" from the standard at issue in *Cope*, the striking similarities between the ordinance language in *Wakelin* and *Cope* and the language that is at issue here requires that we apply the principles of those more recent cases to the present case.

The court suggests that the Ordinance, read in its entirety, provides the Board and applicants with the quantitative standards required by *Wakelin* and *Cope*. However, I fail to discern any meaningful clarification of terms when the phrase "ground water and surrounding surface waters will not be adversely affected" is reconstituted elsewhere in the Ordinance as prohibiting "pollution of ... water resources," "adverse impacts upon private wells," or "sediment pollution or siltation of any ground or surface water." These standards, collectively or individually, fail to apprise an

---

1. Although *Wakelin* and *Cope* were zoning cases, the prohibition against unduly vague delegations of legislative authority is not confined to zoning cases. We have examined the issue of impermissibly vague standards in a variety of contexts. *See e.g., Board of Dental Examiners v. Brown*, 448 A.2d 881, 884 (Me.1982) (standards

for revocation of dentists' licenses); *Lewis v. State Department of Human Services*, 433 A.2d 743, 746–49 (Me.1981) (state plumbing code); *Superintending School Committee*, 433 A.2d at 386–88 (arbitration board); *State v. Boyajian*, 344 A.2d 410, 412–13 (Me.1975) (pharmaceutical regulations).

applicant of what the Board will consider to be "pollution" or a landfill "adversely affecting" water supplies. Likewise, the vague Ordinance requirement that a landfill site be "controlled to prevent accident and harm" does not derive any definitional substance from its reappearance in the Ordinance as a mandate that the Board consider the "manner and frequency ... and the routes by which the material will be transported" or as a requirement that a landfill be developed in a way that prevents "unreasonable burdens being placed upon the town roads and traffic conditions." Finally, the court concludes that the purpose of the Ordinance narrows the meaning of the requirement that a developer have "adequate technical and financial capacity" to construct a landfill. However, the stated purpose of the Ordinance[2] is even more open-ended than the phrase that the purpose is supposed to explicate.

The court's opinion states that the challenged provisions in the Ordinance should be upheld, based on our opinions in *Maine Clean Fuels* and *Spring Valley*. Both

cases involved challenges to the constitutionality of the Site Location Law ("SLL") in effect at that time, 38 M.R.S.A. §§ 481–488. The SLL set forth criteria to be used by the state's Environmental Improvement Commission ("EIC") in reviewing development proposals. These standards were similar to those at issue here, and were challenged on vagueness grounds. In both cases, we found the SLL criteria to be "adequate guides" to control the EIC's enforcement power. *Maine Clean Fuels*, 310 A.2d at 742; *Spring Valley*, 300 A.2d at 752.

Notwithstanding *Maine Clean Fuels* and *Spring Valley*, *Wakelin* and *Cope* emphasize the need for municipalities to exercise responsibly their delegations of legislative authority to municipal committees by ensuring that adequate standards are established to guide decision making.[3] I would employ this approach here and not ignore the teachings of these two recent cases. There is a growing body of state and federal regulations and standards governing landfills.[4] The evolving standards and lit-

2. The express purpose of the Ordinance reads, in full, as follows:

> *Section 2. Purpose.* The purpose of this Ordinance is to protect the public health and property values of the citizens of the Town of Norridgewock by controlling the disposal of all discarded matter in such a manner as to prevent: a) the pollution of air, land, or water resources of the town; b) littering and unsightliness on the way to and around disposal areas; b) [sic] adverse impacts upon private wells; d) erosion; and e) unreasonable burdens being placed upon the town roads and traffic conditions.

3. The court states that the constitutional sufficiency of the guidelines is more central to this case than whether the Town should have provided the applicants with more specific standards. The court's distinction is irrelevant, however, since our determination of whether the guidelines pass constitutional muster turns on whether they were sufficiently specific. The court attempts to buttress its argument by stating in a footnote that effective regulation "in some instances 'requires a flexibility and attention to changing technology which are incompatible with more detailed standards.'" At 323 n. 4 (quoting *Lewis*, 433 A.2d at 749). The court fails to mention that when more detailed standards are not compatible with a changing technology, "the presence of adequate procedural safeguards to protect against an abuse of discretion by those to whom the [legislative] power is

delegated compensates substantially for the want of precise guidelines and may be properly considered in resolving the constitutionality of the delegation of power." *Lewis*, 433 A.2d at 749, (quoting *State v. Boynton*, 379 A.2d 994, 995 (Me.1977)). *See also Northeast Occupational Exchange, Inc. v. State*, 540 A.2d 1115, 1117 (Me.1988). Surely the provision of a public hearing—a hearing which, the record reflects, was more a public forum for aggrieved citizens than a due process hearing—is an adequate procedural safeguard to protect the rights of applicants. Without either adequate procedural safeguards or precise guidelines to guide decision making, an applicant for a landfill permit is at the mercy of the Norridgewock Board's unconstrained discretion. This is exactly the outcome that the prohibition against standardless delegation was intended to prevent, and it should not be abided in the instant case.

4. For example, the State's Department of Environmental Protection has promulgated extensive regulations pertaining to landfill development. Among these regulations is a precise, objective definition of what constitutes a "contaminant." *State of Maine, Department of Environmental Protection: Solid Waste Management Rules*, ch. 400 § 11(F) (1983 and 1987 revision). For other examples of specific, quantitative standards that can be used in landfill regulation, one can look to the following publications

erature in this field represent an increasingly sophisticated approach to landfill regulation that renders the promulgation of specific standards for landfills more feasible than ever before. Considering the current practicability of creating quantitative criteria for landfills, along with the dangers of potential favoritism and arbitrariness associated with unduly vague delegations of legislative authority, it is reasonable to expect the Town to meet minimal due process and equal protection requirements by unequivocally placing applicants on notice of what they will be required to do in order to obtain Town approval of a landfill application.

Applying the teachings of *Wakelin* and *Cope* to this case, I would vacate the judgment of the Superior Court on the ground that the provisions of this Ordinance constitute an impermissibly vague delegation of the Town's legislative authority to the Board of Selectmen.

from the United States Environmental Protection Agency: *Lining of Waste Impoundment and Disposal Facilities* (1983); *Evaluating Cover Systems for Solid and Hazardous Wastes* (1980); *Hydrologic Simulation of Solid Waste Disposal Sites* (1980).