STATE OF MAINE                                    SUPERIOR COURT
                                                    CIVIL ACTION
YORK, ss.                                        DOCKET NO: AP-05-005

                                                    CAP - YOR - 9 .../

HANNAFORD BROS. CO.,

                        Appellant

        v.                                       **ORDER**

TOWN OF KENNEBUNK,

                        Appellee

        This case comes before the Court on Hannaford's Rule 80B appeal of the Town of

Kennebunk Planning Board's site plan and subdivision application approval of "the

Kennebunk Market Place," to be developed by G.I. Kennebunk, LLC.  Following

hearing, the Planning Board's decision is Affirmed.

                                **BACKGROUND**

        On December 27, 2004, after two years and thirteen public meetings, the Town of

Kennebunk Planning Board ("Planning Board") approved the site plan and subdivision

application for the development of the Kennebunk Market Place, a 65,665 square foot

Stop and Shop, two separate retail buildings with a total of 16, 589 square feet and a

5,926 square foot restaurant located on a lot north of the town on Route 1 (Portland

Road).  G.I. Kennebunk is the developer and Hannaford is the abutting property owner

objecting to the development.[1]

        Hannaford contends that the Planning Board erred in the following ways:  First,

the site plan proposes one street connection in violation of the Street and Design

Ordinance, which requires two street connections to Portland Road for a development

---

[1]     As owner of 12.7 acres across Portland Road from the proposed Kennebunk Market Place,
Hannaford actively participated in each of the Planning Board meetings.

generating more than 250 trips per day. R. Vol. I, p. 49. Second, the Planning Board lacked the authority to accept contributions for mitigation costs from G.I. Kennebunk, and to condition approval on requiring a traffic study within one year of full occupancy in place of requiring strict compliance with site plan standards. R. Vol. IV, p. 1615. Third, the site plan violates Article 11, § 8 (7)(e) of the Kennebunk Zoning Ordinance, which requires internal road connectors and rear access roads for developments east and west of Portland Road. Finally, Hannaford argues that the project violates title 30-A M.R.S.A. § 4404 and the Kennebunk Comprehensive Plan by accepting a lower level of service (LOS) for road traffic than the Zoning Ordinance requires; by failing to foster commercial growth in the Downtown area; and by approving the project without first determining that G.I. Kennebunk, the applicant, has the financial capacity to sustain this project.

## DISCUSSION

The Superior Court reviews the findings of the Planning Board "for an abuse of discretion, error of law, or findings unsupported by substantial evidence in the record." *Yusem v. Town of Raymond*, 2001 ME 61, P7, 769 A.2d 865, 869. As the party seeking to overturn the Planning Board's decision, Hannaford has the burden of establishing that the evidence compels a contrary conclusion. *Herrick v. Town of Mechanic Falls*, 673 A.2d 1348, 1349 (Me. 1996). In other words, a demonstration that no competent evidence supports the local board's findings is required in order to vacate the board's decision. *Thacker v. Konover Dev. Corp.*, 2003 ME 30, ¶ 8, 818 A.2d 1013, 1017. The Court will not substitute its own judgment for that of a local administrative board. *Thacker*, 2003 ME 30, ¶ 8, 818 A.2d at 869.

Interpretation of the provisions of an ordinance is a question of law. *Kurlanski v. Portland Yacht Club*, 2001 ME 147, ¶ 9, 782 A.2d 783, 786. The language at issue in the

2

ordinance must be construed reasonably and with regard to both the ordinance's specific object and its general structure. *Id.* Each undefined term is generally given its common and generally accepted meaning unless the context of the ordinance clearly indicates otherwise. *See Town of Union v. Strong,* 681 A.2d 14, 17 (Me. 1996) (interpreting a statute).

a.   The Street Design and Construction Standards Ordinance

Hannaford argues that the Street Design and Construction Standards Ordinance ("Street Ordinance") requires this project to have two street connections with existing streets. In response, the Town argues that in order for the Street Ordinance to apply, the project must propose the extension or creation of a new street. In the alternative, Hannaford argues that the entrance to the project and the two internal connector roads on the east and west constitute streets and require compliance with the ordinance.

The disputed language of the Street Ordinance is in sections 8.6.2 and 8.6.2 (F). These sections provide, inter alia, that "all proposed streets shall be designed and constructed as follows: . . . Developments containing over 25 dwelling units or which generate average daily traffic (ADT) of over 250 trips per day, shall have at least two street connections either with existing public streets, or with streets shown on approved subdivision plan or site plan for which a performance guarantee has been filed and accepted." R. Vol. I, p. 49.

While Hannaford interprets the language of section 8.6.2 and 8.6.2 (F) as requiring two street connections for the Kennebunk Market Place, this language must be construed reasonably and with regard to the Street Ordinance's specific objective and its general structure. *Kurlansky,* 2001 ME 147, ¶ 9, 782 A.2d at 786. The stated objective of the Street Ordinance "is to establish appropriate standards for the design and construction of all streets in the Town, and to establish a procedure for the

3

petitioning of streets to the Town for acceptance as Town Ways." Street Design and Construction Standards Ordinance, § 8.2; R. Vol. I, p. 45.[2] The general structure of the Street Ordinance is such that each section of the Ordinance has a caption having to do with existing or newly proposed streets.[3] Furthermore, the language of the waiver/variance provision requires that there be a street to apply the waiver/variance to.[4]

Taken as a whole, the specific objective, general structure, and context of the Street Ordinance illustrate that for the Street Ordinance to apply, the project must be proposing the extension or creation of a new street. However, because the entrance to the Kennebunk Market Place is a private driveway, and the internal connectors are not "streets,"[5] the Street Ordinance does not apply.[6]

---

[2]    These standards are designed to promote, inter alia, the health, safety, and welfare of the Town's inhabitants; and to provide safe and convenient vehicular and pedestrian circulation. *Id.*; R. Vol. I, p. 45.

[3]    For example, section 8.2 defines the terms "Average Daily Traffic," "Driveway," "Street," and "Town Way;" section 8.4, lays out the procedures for proposing a street for Town acceptance; section 8.4.2 explains the application procedure for street acceptance; section 8.5 explains how to classify existing or proposed streets; and section 8.6 describes the street design and construction standards.

[4]    Section 8.8 of the Ordinance also provides that a provision may be waived where extraordinary and unnecessary hardships would result, or due to the special circumstances of the site, certain requirements of this ordinance may be varied or waived by the Board of Selectmen based upon the following criteria:

> 1) the requested variance/waiver shall have been previously reviewed and approved by the Planning Board (if the street is part of a subdivision plan review) or by the Site Plan Review Board (if the street is part of a site plan review). Such approval shall specifically address the impact of the requested variance/waiver upon: the safe functioning of the street, the long term costs of maintaining the street, and the Town's ability to provide public services along the street.
>
> 2) The required thickness of pavement shall not be reduced, and
>
> 3) A report from the Town's Highway Superintendent and Town's Consulting Engineer concerning the expected performance of the street (per the criteria listed in subsection A.1. above) if variance/waiver is granted.

Street Design and Construction Standards Ordinance, § 8.8 (Emphasis added).

[5]    The Street Ordinance defines "street" as: "such public or private ways as alleys, avenues, highways, roads, streets and other rights-of-way which are used or intended to be used for passage or travel by motor vehicles. The term street shall not include driveways."

4

b.     Conditions/Impact Fees

Hannaford argues that absent an impact fee ordinance, the Planning Board lacked the authority to accept contributions for mitigation costs from G.I. Kennebunk in lieu of requiring strict compliance with site plan standards.[7]  It also argues that the Planning Board did not have the authority to condition the site plan approval on requiring the applicant to conduct a traffic study within one year of full occupancy.

Under title 30-A M.R.S.A. § 4403(5) (1996), a planning board may grant subdivision approval "upon any terms and conditions that it considers advisable" in order to satisfy the criteria listed in section 4404, any other applicable regulation, or to protect and preserve the public's health, safety, and welfare.[8]  In this case, the Planning

---

The Street Ordinance defines "driveway" as:  " a private entrance from a street or right-of-way to a building or buildings on abutting grounds.  The driveway itself shall not constitute the means of legal access to a lot.

[6]     As further support for this interpretation of the Street Ordinance, the Zoning Ordinance provides that the Street Ordinance applies when the development proposes the extension or creation of a street. Article 11, § 8 (7)(a); R. Vol. I, p. 314.   Furthermore, the only requirement arising from the number of vehicles visiting the site on a daily basis concerns the level of service ("LOS") of the intersections.  Article 11, § (7)(c); R. Vol. I, p. 315.

[7]     The Planning Board found that the project would not cause unreasonable highway congestion or unsafe conditions with the following conditions: "fair share contributions made to Town to be used for mitigation at Portland Road Post Office Square ($50,000), and Maine Street at High Street ($7,500) to be provided with performance guarantee and returned to the applicant after 10 years, if improvements are not made by the Town."

[8]     Title 30-A M.R.S.A. § 4404 provides that the municipal reviewing authority shall consider the following criteria before granting subdivision and site plan approval, and must determine, inter alia, that:

5. TRAFFIC. The proposed subdivision will not cause unreasonable highway or public road congestion or unsafe conditions with respect to the use of the highways or public roads existing or proposed and, if the proposed subdivision requires driveways or entrances onto a state or state aid highway located outside the urban compact area of an urban compact municipality as defined by Title 23, section 754, the Department of Transportation has provided documentation indicating that the driveways or entrances conform to Title 23, section 704 and any rules adopted under that section;
 . . .

9. CONFORMITY WITH LOCAL ORDINANCES AND PLANS. The proposed subdivision conforms with a duly adopted subdivision regulation or ordinance, comprehensive plan, development plan or land use plan, if any. In making this determination, the municipal reviewing authority may interpret these ordinances and plans;

10. FINANCIAL AND TECHNICAL CAPACITY. The subdivider has adequate financial and technical capacity to meet the standards of this section.

Board was acting within its statutory authority by attaching conditions in the form of contributions made to the Town in order to ensure that resources would be available to make the project safer. The Planning Board specifically indicated that the contributions would be returned to the applicant if improvements were not made within ten years. Similarly, requiring the applicant to conduct a traffic study within one year of full occupancy in order to make improvements is a condition that furthers traffic safety. Beyond this, the necessary project approval from the Maine Department of Transportation likewise required the same mitigation payments. Thus, the Planning Board did no more than to require the applicant to satisfy the condition imposed by the M.D.O.T. approval.

c.   Internal Connection Roads

Hannaford argues that the site plan violates Article 11, § 8(7)(e) of the Kennebunk Zoning Ordinance, which requires 24 foot wide rear connection roads and internal road connectors east and west of developments along Portland Road.

Article 11, section 7(e) of the Kennebunk Zoning Ordinance provides that a rear connection road shall be considered as part of the site design for projects proposed along the Route One corridor in order to avoid future intersection conflicts.[9]  While rear

---

30-A M.R.S.A. § 4404.

[9]     Article 11, § 7(e) of the Zoning Ordinance provides:

[f]or all projects, provision for vehicle and pedestrian connection to adjacent sites shall be considered. Provision of a rear connection road shall be considered as part of the site design for project proposed along the Route One corridor in order to avoid future intersection conflicts. For sites along the Portland Road corridor conformance to the recommendations of Figure 10 of the Portland Road Traffic Management Study shall be required. . . .

(In order to function as a connector road, the design for the road shall be free of perpendicular or angle parking, shall provide a minimum of a 24 foot travel way and be designed in terms of horizontal and vertical alignments for a minimum design speed of 30 mph.).

Article 11, § 7(e) (emphasis added); R. Vol. I, p. 315.

connection roads shall be considered, the Ordinance makes compliance with Figure 10 of the Portland Road Traffic Management Study a requirement.[10] According to Figure 10, developers must provide internal road connectors to parcels east and west of Portland Road as they are developed.[11]

Here, the Planning Board approved an internal connector road to the Farragut property on one side of the project which is 18 feet wide.[12] On the other side of the project, the Horn property remains undeveloped. As such, the Planning Board approved the completion of the future connection to the edge of the applicant's property abutting the Horn property.

According to the Ordinance, internal connector roads must be 24 feet wide. However, the Planning Board may waive this requirement if it finds that "unnecessary hardship will result, or where there are extraordinary circumstances of a particular plan." Article 11, § 9; R. Vol. I, p. 316.

In its Findings of Fact, the Planning Board prefaced the Traffic section in the following way: "The Board, with four in favor and one opposed, finds that this standard is met with the following conditions and/or waiver:" Proceeding to subsection (c), which pertains to the internal road connectors, although the Planning Board did not explicitly state that it found unnecessary hardship or extraordinary circumstances warranting a waiver of the 24 foot requirement for internal connector roads, the record supports the conclusion that it did so. The roadway within the Farragut property is a limited access, private way. The underlying easement is at least

---

[10]     Supra, n. 9.

[11]     Figure 10 of the Portland Road Traffic Management Study provides: "As development occurs along Portland Road, it is recommended that developers be required to provide internal road connections on parcels east and west of Portland Road as they are developed." R. Vol. II, p. 716.

[12]     Although the Findings of Fact do not refer to the exact width of the road, the Town concedes as much. The Town also contends that the easement area between the two properties is substantially wider than 18 feet.

7

twenty-four feet wide. Consideration was given to erecting a gate to control access to the Farragut property. The Planning Board approved the proposal with the condition that this issue be reviewed after one year of actual experience. While it would have been preferable had the Planning Board made explicit findings on this point, a fair reading of the record reveals its findings, and those findings are supported by the evidence adduced at hearing.

d.    30-A M.R.S.A. § 4404

Finally, Hannaford argues that the project violates title 30-A M.R.S.A. § 4404 and the Kennebunk Comprehensive Plan ("KCP") by failing to foster commercial growth in the Downtown area; by accepting a lower level of service (LOS) than the Town's Ordinance Standards require and by approving the project without first determining that G.I. Kennebunk, the applicant, has the financial capacity to sustain this project.

Pursuant to 30-A M.R.S.A. § 4404 (Supp. 2004), before a subdivision may be approved, the Planning Board must determine that 1) it will not cause unreasonable-highway or public road congestion or unsafe conditions with respect to the use of the highways; 2) that the proposed subdivision conforms with local ordinances and the Town's Comprehensive Plan; and 3) that the subdivider has adequate financial capacity to meet the standards of this section.[13]

The Court must determine whether, from the evidence before it, the Planning Board could have determined that the Kennebunk Market Place site approval was in basic harmony with the KCP. See *LaBonta v. City of Waterville*, 528 A.2d 1262, 1265 (Me. 1987). Hannaford bears the burden of proving that the approval of the Kennebunk Market Place site plan is inconsistent with the KCP. See *Aldeman v. Town of Baldwin*, 2000 ME 91, ¶ 22, 750 A.2d 577, 584.

---

[13]    *Supra*, n. 8.

1.  Failing to Foster Commercial Growth in the Downtown Area

Hannaford argues that the development of the Kennebunk Market Place violates the KCP by diverting commercial growth from downtown Kennebunk. However, the KCP specifically envisioned a large-scale supermarket along Route One, north of the village. R. Vol. II, p 456. Moreover, Article 8, § 13.A of the Zoning Ordinance characterizes this part of Route One as a suburban commercial district designed "to provide an area well suited for automobile-oriented commercial and industrial activity." R. Vol. I, p. 190. Hannaford has not met its burden of proving the approval of the Kennebunk Market Place site plan is inconsistent with the KCP.

2.  Level of Service

Hannaford asserts that pivotal intersections within one-half mile of the Kennebunk Market Place will drop from acceptable LOS levels during peak travel times. As such, Hannaford argues that the Planning Board violated local ordinances and the KCP by accepting a lower level of service (LOS) than the Planning Board Standards require.[14]

Article 11, § 8 of the Zoning Ordinance provides the criteria for approving subdivision site plans. R. Vol. I, p. 307. According to §8(7)(c), for intersections on access roads functioning at LOS "D", and within one-half mile of a project driveway generating 500 or more daily new vehicle trips, the project will not reduce the current level of service. R. Vol. I, p. 314. The KCP, which expressly incorporates the Portland Road Traffic Management Study, provides that "[i]n village or central business districts,

---

[14]     Hannaford also argues that the Planning Board had no authority to decide that Storer Street should not be reduced to one lane after the 2003 KCP Update decided to consolidate Storer Street to a single lane to reduce sideswipe accidents. However, a 2004 report of Diane Morabito, the Town's traffic engineer at Casey & Godfrey, indicates that the overall intersection will fail if Storer Street is converted to a single lane under the Market Place volumes. The Planning Board was within its authority to approve a plan that promotes safer traffic patterns.

LOS "E" is generally considered the minimum acceptable level." R. Vol. II, p. 685.[15] However, the Town is permitted "to tolerate periodic, short-term low levels of service in certain parts of Town, such as Downtown, if major reconstruction that would change their character can be avoided as a result." R. Vol. II, p. 481.

In arguing that the Planning Board erred by allowing lower than acceptable levels of service, Hannaford refers the Court to a 2003 traffic study conducted by Gorril-Palmer Consulting Engineers. R. Vol. V, p. 1701. The 2003 study indicates that more than one-half mile from the site, the Main Street/Summer Street intersection will drop from LOS E to LOS F. Further, within one-half mile from the site the study indicates that the Merrifield Drive/Portland Road intersection will drop from LOS C to LOS D during weekday hours; the Shoppers Village/Portland Road intersection will drop from LOS C to LOS D; the Shape Drive/Portland Road intersection will drop from LOS C to LOS D, and lower to LOS E in the westbound left lane during weekday peek hours.

The Planning Board subsequently commissioned a peer review of the Gorrill-Palmer report from Diane Morabito, the Town's traffic engineer at Casey & Godfrey Consulting Engineers. R. Vol. V, pp. 1822-1825. In response to each of the above-mentioned intersections, the 2004 review states that at the Maine Street/Summer Street intersection, the LOS will drop to F post construction until improvements are made, which will return the LOS to E. R. Vol. V, p. 1835. Furthermore, the applicant has agreed to conduct a traffic study of this intersection within one year of full occupancy and to make improvements if the Planning Board requires as much. R. Vol. IV., p. 1615. In regards to the Merrifield Drive/Portland Road intersection, the Town has recently relocated the traffic signal at this intersection to provide separate left and right turn

---

[15] The 2003 Comprehensive Plan Update states: "all site plans for development occurring along the Portland Road corridor are required to conform to the recommendations of the Portland Road Traffic Management Study." R. Vol. I, p. 827.

lanes, which will return the LOS to its original level. R. Vol. V, p. 1835. In regards to the Shoppers Village/Portland Road intersection, the Town has recently obtained a right of way for future construction of a right turn lane on northbound Portland Road into Shopper's Village. *Id.* The applicant has agreed to construct this right turn lane, which will return the LOS to its original level. In regards to Shape Drive/ Portland Road, an intersection with no traffic light, Diane Morabito admits that some side street approaches do not operate at acceptable LOS levels but will in time with planned Town improvement projects. R. Vol. V, p. 1807. Because the Town is permitted to tolerate periodic low levels of service until improvements are made, the failure of Shape Drive to meet an acceptable LOS level at this time is not fatal to the site plan approval.

At the outset, the Planning Board made clear that traffic was an important concern. R. Vol. IV, p. 1416. Two of the thirteen public hearings in this matter were devoted almost entirely to traffic issues whereby the Planning Board examined various traffic studies and heard from a number of traffic engineers. R. Vol. IV, pp. 1409-1422, 1500-1514. While there may be conflicting opinions regarding the LOS issue, there is competent evidence in the record to support the Planning Board's decision. The Court will not substitute its judgment for that of the Planning Board.

3. Financial Capacity

Hannaford argues that the Planning Board approved the subdivision site plan without sufficient evidence of the applicant's financial capacity. In response, G.I. Kennebunk argues that it provided financial documents from Great Island Development Group, ("Great Island"), the manager of G.I. Kennebunk. G.I. Kennebunk and the Town also argue that because the Planning Board conditioned the subdivision approval on the submission of a valid performance guarantee, the financial capacity requirement has been satisfied.

11

The Planning Board Standards Ordinance ("Standards Ordinance), Article 1(J), in compliance with 30-A M.R.S.A. § 4404 (Supp. 2004), requires that the Planning Board determine, inter alia, that the developer has adequate financial capacity to meet the standards of these regulations prior to subdivision approval. R. Vol. I, p. 3. Article 12.2 also requires a submission of a performance guarantee for an amount to cover the total construction costs of all required improvements before granting subdivision approval of the site plan.[16] R. Vol. I, p. 40.

The requirement that the applicant demonstrate adequate financial capacity must be read in the context of the purpose of the ordinance. See *Secure Environments, Inc. v. Norridgewock*, 544 A.2d 319, 325 (discussing whether the ordinance contained sufficient guidelines to allow for effective judicial review). The stated purpose of the Town of Kennebunk's Standards Ordinance is "to assure the comfort, convenience, safety, health and welfare of the people, to protect the environment and to promote the development of an economically sound and stable community." R. Vol. I, p. 3. The obvious purpose of the ordinance is to reasonably insure that a developer will have sufficient financial capacity to successfully complete a project once approval is granted.

In *Bruk v. Town of Georgetown*, 436 A.2d 894, 898 (Me. 1981), the Law Court reviewed a planning board's finding that the subdivider did not have adequate financial capacity to meet statutory and ordinance standards. Although the planning board did receive a letter from a financial institution indicating that $50,000 would be available for developmental purposes for this project, no evidence was submitted of the applicant's access to other funds. *Id.* Furthermore, the applicant did not provide the planning board with evidence of anticipated construction costs.

---

[16]     The purpose of a perfomance guarantee is "to ensure the proper installation of required street, utility, storm drainage and other improvements."

While not controlling, in *Seaforth Housing, LLC, v. City of Portland,* 2005 Me. Super. LEXIS 194, the Cumberland County Superior Court recently affirmed a planning board's finding that a subdivider had financial capacity to meet statutory and ordinance standards. In order to demonstrate financial capacity, the Portland Ordinance requires a letter from a responsible financial institution stating that it will seriously consider financing the project if requested to do so. The evidence before the planning board was a cover letter indicating an estimated construction cost of $17,000,000, and a letter from Key Bank stating that it had a strong interest in proceeding with financing the project in the amount of $20,000,000.

Here, in contrast to the Portland Ordinance in *Seaforth,* the Standards Ordinance does not prescribe criteria for determining financial capacity. As such, the Planning Board made its decision based on the following evidence in the record: a subdivision application listing G.I. Kennebunk as the applicant and Great Island as its manager; a cover letter from G.I. Kennebunk and Great Island indicating that the total anticipated construction costs are $2,301,100 for the project; a letter from Great Island stating that it owns and manages approximately 5,000,000 square feet of retail shopping centers and malls throughout the New England area; and a letter from Great Island's business manager indicating that Great Island maintains a seven figure cash balance in its bank account. R. Vol. III, p. 920; R. Vol. V, pp. 1778-1780.

Hannaford takes the position that the performance guarantee cannot be substituted for evidence of financial capacity. The Court agrees. According to the Standards Ordinance, both a determination of financial capacity and a performance guarantee are required before the Planning Board approves a subdivision site plan. The issue then becomes whether the Planning Board can rely on financial information from G.I. Kennebunk's parent company to determine financial capacity.

13

Great Island is G.I. Kennebunk's parent company which, unlike an unrelated financial institution which merely states an interest in funding the project, is intimately linked to the applicant and has been involved in the process from the outset. The Planning Board could reasonably have determined that the relationship between these two companies is such that G.I. Kennebunk has access to the funds of its parent company.[17] The Court will not substitute its judgment for that of the Planning Board on this score. Because the Standards Ordinance does not prescribe criteria to determine financial capacity, G.I. Kennebunk's access to its parent company's account to fund the project is sufficient evidence of the financial capacity of G.I. Kennebunk.[18]

The entry is as follows:

The decision of the Planning Board is affirmed.

DATE: 2/6/06

G. Arthur Brennan
Justice, Superior Court

PLAINTIFFS:
Peggy McGehee, Esq.
PERKINS THOMPSON HINCKLEY AND KEDDY
PO Box 426
Portland Me 04112-0426

DEFENDANT THE TOWN OF KENNEBUNK:
Natalie Burns, Esq.
William Dale, Esq.
JENSEN BAIRD GARDNER AND HENRY
PO Box 4510
Portland Me 04112-4510

P.I.I.   G I KENNEBUNK, LLC
Durward Parkinson, Esq.
BERGEN AND PARKINSON
62 PORTLAND RD
KENNEBUNK ME 04043-6658

---

[17]    Although under Maine Law, the manager of an LLC is not held liable for its debts, 31 M.R.S.A. § 645, neither is a financial institution by indicating its interest in funding a project.

[18]    Pursuant to the Standards Ordinance, Article 12.2(4), the Planning Board appropriately conditioned the subdivision approval on G.I. Kennebunk's submission of a performance guarantee to be approved by the Town Manager within one year of Final Plan Approval and prior to any conveyance of lots of issuance of building permits. R. Vol. I, p. 40; R. Vol. IV, p. 1617.